RIMM, J.T.C.
This is a local property tax matter involving valuation and discrimination for the tax year 1989. The original assessment on the property for the tax year 1989 was as follows:
[[Image here]]
The subject property is designated as Block 295, Lot 3 on the tax assessment records of the municipality. The property is located on the north side of Newman Springs Road, east of the intersection of Newman Springs Road and Half Mile Road. It has a total area of 3.76 acres with frontage of approximately 276 feet on Newman Springs Road and a depth of approximately 550 feet. The property is located in a section of the municipality zoned B-3. The improvements constitute a permitted use. They consist of a steel frame three-story office building with glass and masonry enclosing walls. The major portion of the construction took place during 1984 and 1985. The building is serviced by two elevators, and there are 206 on site parking spaces. The building has central heat and air conditioning, and there are two rest rooms on each floor. The center of the building has a triangular atrium which contains the two elevators.
Prior to the taking of testimony, the parties stipulated as follows:
*407 1. The highest and best use for the property is its current use, an office building.
2. If the income approach to value is to be used to value the subject property, the following amounts are correct for the expense items indicated:
[[Image here]]
3. The capitalization rate is 12.05%, including the effective tax rate.
4. The total area in the building is 60,096 square feet.
5. The land value is $850,000.
Each party called as its only witness its appraisal expert. The taxpayer’s appraiser valued the property by the cost approach and the income approach. He testified that both of these approaches were applicable because the improvements were relatively new and the property was held for income-producing purposes. The value of the property by the cost approach was $5,326,000. The value of the property by the income approach was $5,653,000. The witness said that, after considering both approaches, it was his opinion that the subject property had a value of $5,500,000 for the tax year 1989 as of October 1, 1988.
The municipality’s appraiser similarly valued the property by the cost and income approaches. By the cost approach, the property had a value of $6,981,500. By the income approach, the property had a value of $6,130,000. This witness indicated that he gave the greater weight to the income approach and *408 concluded that the property had a value of $6,800,000 for the tax year 1989 as of October 1, 1988.
In valuing real property for local property tax purposes, the cost approach is acceptable if use of the other methods is not appropriate, or if the facts submitted in support of the cost approach are more reliable than those submitted in support of any other approach. Coca-Cola Bottling Co. of New York v. Neptune Tp., 8 N.J.Tax 169, 176 (Tax Ct.1986); Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51 (Tax Ct.1982); ITT Continental Baking Co. v. East Brunswick Tp., 1 N.J. Tax 244 (Tax Ct.1980). The cost approach is certainly a valid approach to the value of real property when the improvements to be valued are relatively new. However, the income approach is the preferable approach when valuing income-producing property if there is sufficient, credible evidence on the basis of which the value can be established. “The income capitalization approach is typically used in market value appraisals of income-producing property.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed.1987) 411. To the same effect is Ft. Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 227, 417 A.2d 1124 (App.Div.1980) (The income approach “is ‘[t]he preferred valuation method for apartment buildings ... since investors purchase apartment buildings as income-producing properties.’ ”); G & S Co. v. Eatontown, 2 N.J.Tax 94 (Tax Ct.1980), aff’d 6 N.J.Tax 218 (App.Div.1982).
Given the stipulations in this matter, the income approach may be used to value the subject property upon the resolution of the differences of opinion between the two experts relating to economic rent, the vacancy factor and the expense items of HVAC maintenance, management, repairs and maintenance, commissions on rentals, reserve for replacements, professional fees, advertising and office expense.
Taxpayer’s expert’s opinion was that economic rent for the subject property as of October 1, 1988 was $17 a square foot, plus payment of electricity by the tenant for its rented space. He based his opinion of economic rent on 12 leases in the *409 subject premises and five leases in comparable office buildings. The municipality’s appraiser concluded that the economic rent as of October 1, 1988 was $17.50 a square foot. In arriving at his opinion of economic rent, he relied on three leases in the subject property.
The difference of opinion of economic rent between the two experts relates essentially to rent concessions. Of the 12 leases in the subject property used by the taxpayer’s appraiser, six leases involve rent concessions of either rent-free months or months with reduced rentals when compared with the “face” rent for the balance of the lease. One lease involves three months rent free; one lease involves three months rent free and an additional three months at a reduced rental; one lease involves three months at a reduced rental; two leases involve two months rent free and an additional two months at a reduced rental; and one lease involves two months at a reduced rental. Of the five leases in other comparable office buildings, three leases involve rent concessions, one with five months’ free rent. The appraiser for the municipality refused to consider these rent concessions in arriving at his opinion of economic rent. However, given the testimony of the taxpayer’s appraiser and the rental history of the building, I find that there was a soft market for office space at the time involved, that rent concessions were necessary, that they should be considered in arriving at economic rent, and that the economic rent for the subject property as of October 1, 1987 was $17 a square foot. GlenPointe Associates v. Teaneck Tp., 10 N.J.Tax 506, 522 n. 8 (Tax Ct.1989) (“The finding of economic rent reflects rent concessions....”)
... [W]hen real estate markets are over supplied, landlords give tenants concessions such as free rent for a specified period of time____ All rent concessions result from market conditions and the relative negotiating strengths of the landlord and the tenant____ To calculate scheduled rent, an appraiser must adjust for rent concessions, discounts, or other benefits that may induce a prospective tenant to enter into a lease. These concessions, or offsets, usually take the form of rent free months at the beginning of the lease term---- [American Institute of Real Estate Appraisers, op. tit., supra at 434, 444]
*410 Contract rent, or the portion of potential gross income derived from the rent level actually in effect on the date of the appraisal, must be translated into effective rental fates. “[Cjoncessions are most typically granted in the form of free rent, usually at the beginning of a lease term.” Barnes, “Rental Concessions and Value”, The Appraisal Journal (April 1986) at 167.
The dispute between the parties on expense items may be summarized as follows:
[[Image here]]
Both appraisers made an analysis of actual operating expenses in the subject property for 1986, 1987 and 1988 with a view to stabilizing expenses. The HVAC maintenance expense varied from a low of $6,618 to a high of $15,782. Based on the analysis of the two experts and the actual expense figures, I find that the proper expense item for HVAC maintenance is $12,000. For the general expense item of repairs and maintenance, I shall use the taxpayer’s figure of $5,000. Given that the expenses already include separate items for elevator maintenance, lawn maintenance and HVAC maintenance, I shall use the taxpayer’s amount of $5,000 for the general category of repairs and maintenance. This is reflective of the actual history of the building for the years 1986, 1987 and 1988, whereas the municipality’s expert used 3% for this item which would amount to $29,116.
*411 The municipality’s appraiser did not allow any amount as an expense for professional fees in his appraisal. However, on cross-examination, he acknowledged that an expense for professional fees is proper. He further indicated that the taxpayer’s amount of $7,500 was reasonable and probably correct. Accordingly, I find that an expense in the amount of $7,500 for professional fees is to be allowed.
The municipality’s appraiser testified that, since the taxpayer did not actually set aside funds for each year to replace building components, a reserve for replacements as an expense item is not proper. On the other hand, the taxpayer’s appraiser allowed 2% of potential gross income as an expense item for reserves for replacement. He did this on the basis of his analysis of the various component parts in the building which have a life expectancy less than the economic life of the structure. The latter approach is correct and an expense for reserves for replacement will be allowed. Replacement reserves, or replacement allowances, provide for the periodic replacement of components that wear out more rapidly than the building itself and must be replaced periodically during the building’s economic life. These components may include the roof, elevators, sidewalks and parking areas.
The annual allowance for each component is usually estimated as the anticipated cost of its replacement prorated over its anticipated remaining economic life, provided this does not exceed the remaining economic life of the structure____ [I]n preparing a reconstructed operating statement for a typical year, an appraiser recognizes that replacements must be made eventually and that replacement costs affect operating expenses, which can be reflected in increased annual maintenance costs or, on an accrual basis, as an annual replacement allowance. [American Institute of Real Estate Appraisers, op. cit., supra at 450-451]
It is not necessary that the funds be actually set aside in order that a reserve for replacements be recognized as an expense. However, it is necessary to recognize the anticipated expense of replacing components of the building in order to spread that expense over the life of the component. Not only is this proper appraisal practice, but it results in greater stability of tax assessments. Otherwise, large expenses for replacement of building components would be made in the year of replacement *412 causing severe ups and downs in income and hence in property values used for local property tax assessment purposes.
In dealing with the remaining four items in dispute, management, commissions, advertising and office expense, the municipality’s expert indicated that a management fee of 3% of effective gross income was proper and that no allowance should be made for commissions or advertising. It was his opinion that management included advertising and the services necessary to rent the office space, and that no separate item for commissions or advertising was proper. However, of the 12 leases in the subject property listed by the taxpayer’s appraiser, every one was procured through the efforts of a broker to whom a commission was paid. Nine of the leases involve a commission of 4%, and three of the leases involve a commission of 7%. Of the five leases in comparable office buildings, three of them involve commissions to a broker in the amount of 5%. Based on the actual leases, and the description of the rental market given by the appraiser for the taxpayer, I find that a commission allowance as an expense or a reduction in the amount of rental income actually received is proper, and I will allow a commission expense of 4% of effective gross income as such expense item. In addition, both appraisers agree that an expense item for management is correct, although they disagree on the amount. A careful analysis of the testimony indicates that a management fee of 5% of effective gross income is proper, and I will allow such an expense. No expense for advertising will be allowed. Given the use of brokers, and the allowance of commissions as an expense, an additional allowance for advertising would be duplicative. An office expense deduction will also not be allowed. Such an expense is included in management expense. A trial court judge “as the factfinder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt ‘so much of it as appears sound, reject all of it, or adopt all of it.’ ” Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978).
*413 Although there was no actual stipulation on the vacancy factor, both experts used a 5% vacancy factor. This will be used in determining the net operating income.
Accordingly, the properly reconstructed operating statement for the subject property as of October 1, 1987, to determine value for the full 12 months of the tax year 1988, is as follows:
[[Image here]]
Capitalizing the net operating income of $697,817 by the stipulated capitalization rate of 12.05% gives a value for the subject property of $5,791,012, or $5,791,000, rounded.
The chapter 123 ratio for the municipality for the tax year 1989, is 52.34%. The upper limit of the common level range is 60.19% and the lower limit is 44.49%. The ratio of the assessment to the true value in the subject matter is 78.12%, which *414 exceeds the upper limit of the common level range. Accordingly, the value of $5,791,000 must be multiplied by the average ratio of 52.43% to determine the correct total assessment which is $3,036,221 or $3,036,200 rounded. For administrative purposes, the assessment for the tax year 1989 will use the same assessable value attributed to the land as in the original assessment, with the balance of the assessment applicable to improvements.
Judgment will be entered fixing the assessment for the subject property for the .tax year 1989 as follows:
[[Image here]]