RIMM, J.T.C.
This is a local property tax matter for the tax year 1989. In addition to the issues of valuation and discrimination, two other issues are involved. One issue involves jurisdiction. It arises from the fact that the municipality filed a petition of appeal with the Monmouth County Board of Taxation on August 14, 1989, and the taxpayer filed a complaint by way of direct appeal with the Tax Court on the same day. This issue necessitates a consideration of the ruling of the Supreme Court in Union City Associates v. Union City, 115 N.J. 17, 556 A.2d 769 (1989). The second issue deals with the correct value to be used when considering discrimination relief in the Tax Court, either the original assessment or the county board judgment. See Rumson v. Haran, 3 N.J.Tax 590 (Tax Ct.1981).
The subject property is located on the west side of Half Mile Road, approximately 500 feet north of its intersection with Newman Springs Road (County Rt. 520). It is approximately Vi mile east of exit 109 of the Garden State Parkway. The site is improved with a three-story masonry office building. The subject property is designated as Block 296, Lot 16.05 on the tax map of the defendant municipality. The original assessment is:
[[Image here]]
A county board judgment was entered as follows:
[[Image here]]
Prior to the taking of testimony, the parties stipulated as follows:
*572 1. The highest and best use of the property is its current use, an office building.
2. The land area is 5.483 acres, and the rentable space is 75,345 square feet.
3. The value of the land is $1,312,000.
4. The following expenses are as indicated:
[[Image here]]
5. The capitalization rate to value the property by the income approach as of October 1, 1988, for the tax year 1989, is 12.06%, including the effective tax rate.

Jurisdiction and Discrimination Relief.

In this matter, the taxing district filed a petition of appeal with the Monmouth County Board of Taxation on August 14,1989. On the same day, the taxpayer filed a complaint directly with the Tax Court.
In order to understand the conflict in this case on the question of which forum has jurisdiction, a short assessment history of the subject property must be recited.
For the tax year 1988, the subject property was assessed as follows:
*573 [[Image here]]
On appeal to the Tax Court, a judgment was entered on August 12, 1989 reducing the assessment as follows based on a settlement between the parties:
[[Image here]]
The settlement, placed on the record on July 7, 1989, specifically provided that there would be no agreement between the parties as to the Freeze Act.
Following the placing of the settlement on the record for the tax year 1988, the municipality filed a petition of appeal on August 14, 1989 with the Monmouth County Board of Taxation, reciting the original assessment of $6,074,100 and seeking a reduction in the assessment for 1989 to $5,061,700.
On the same day, August 14, 1989, taxpayer filed a direct appeal with the Tax Court. On October 11, 1989, the Clerk of the Tax Court, in the ordinary course of business, sent a case management notice to the taxpayer’s lawyer and to the municipal attorney. The notice contained the following schedule:
Discovery Completion Date: Wednesday, November 22, 1989.
Exhibit Exchange Date: Wednesday, December 20, 1989.
Trial Date, Time and Location: Wednesday, January 17, 1990,
9:00 A.M., Monmouth County Court House, Freehold, New Jersey.[1]
*574 On January 12, 1990, before the scheduled trial date, a letter was sent by counsel for the municipality, as a result of a conference among both counsel and me, confirming a new appraisal exchange date of February 7, 1990 and a new trial date of February 20, 1990. The trial did not proceed as scheduled and by letter of February 21, 1990 from counsel for plaintiff, the trial was postponed to March 9, 1990.
On February 27, 1990, an order was entered amending the complaint to include an allegation that the judgment of the Monmouth County Board of Taxation was incorrect. A copy of the county board of taxation judgment was attached to the order. The judgment stated that the appeal was heard and considered and a judgment was entered on October 27, 1989 reducing the assessment to $5,061,700. The judgment also recited that it was mailed on February 15, 1990. The basis for the judgment was given as follows: “Petitioner’s request is granted based on 1988 Tax Court Judgment.”
The municipality argues that the county board judgment constitutes the original assessment in this matter for the purpose of determining the taxpayer’s right to discrimination relief under chapter 123. It urges me not to apply Rumson v. Haran, 3 N.J. Tax 590 (Tax Ct.1981), arguing that the county board judgment in this case is nothing more than an administrative correction of the original assessment, and therefore the county board judgment should be treated as the original assessment. It made this argument at the beginning of the case because a lower county board judgment would constitute a smaller percentage of the true value and might obviate discrimination relief under chapter 123.
In arguing against the taxing district’s position that the county board judgment is controlling when the issue of discrimination is considered by the court, the taxpayer urges that the county board of taxation had no jurisdiction to hear the matter, and its judgment is a nullity. The taxpayer relies on Union City Associates v. City of Union City, supra. The issue before the court in that case was whether a taxpayer who *575 initially files a timely complaint in the Tax Court and then files a petition of appeal in the county board of taxation may maintain the appeals in both forums. The Court held that the taxpayer was bound by its election and that it could not maintain appeals in both the county board of taxation and the Tax Court.
The Court referred to N.J.S.A. 54:3-21, the direct appeal statute, and said that a taxpayer whose property is assessed in excess of $750,000 may file an appeal challenging the assessment in either the county board of taxation or the Tax Court. The Court concluded that a taxpayer may not simultaneously pursue identical appeals in both the county board of taxation and the Tax Court. It said that, based on the statutory language, purpose and the legislative history of N.J.S.A. 54:3-21, “exclusive jurisdiction over the matter” was in “the forum in which the taxpayer initially elects to file his appeal.” Union City Associates, supra, 115 N.J. at 24, 556 A.2d 769. Since the filing in the Tax Court had preceded the filing in the county board, the Tax Court had exclusive jurisdiction over the matter. However, the Court went beyond the holding based on time of filing, reviewing the legislation and dealing with policy considerations.
The result the Court reached was dictated by a construction of the statute which would avoid rendering any part of the statute inoperative, superfluous or meaningless. Paper Mill Playhouse v. Millbum Township, 95 N.J. 503, 521, 472 A.2d 517 (1984); Camden City v. Director, Div. of Taxation, 4 N.J. Tax 458, 468 (1982). The court noted that permitting appeals simultaneously in both the Tax Court and the county board of taxation might lead to confusing results since both an original assessment and a county board judgment are entitled to a presumption of correctness. Further, duplicate appeals are inconsistent with the purpose of expediting the tax appeals process, the basis for the creation of the Tax Court in the first place. The Court said that the policy concerns underlying its decision were voiced in Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 476 A.2d 250 (1984). In that case Justice Handler *576 wrote, in concurrence, while discussing the entire controversy doctrine, as follows:
It has been recognized that the underlying principles of the doctrine — ‘finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness’ — have a central place in the adjudication of all legal controversies. [96 N.J. at 350, 351, 476 A.2d 250 (citing City of Hackensack v. Winner, 82 N.J. 1, 32-33, 410 A.2d 1146 (1980)).] [Union City Assoc, v. City of Union City, supra, 115 N.J. at 27, 556 A.2d 769.]
Finally, the Court said that the goals of judicial economy and fairness to the parties dictated the result it reached.
The Court specifically declined to rule on the situation in which a taxing district and a taxpayer appealed the same assessment to different forums. “The only issue before us is whether the same taxpayer may file an appeal in both the county board and the Tax Court.” Union City Associates, supra at 25, n. 4, 556 A.2d 769.
I conclude that the decision of the Supreme Court in Union City Associates requires a determination that filing in the Tax Court in compliance with N.J.S.A. 54:3-21 vests the Tax Court with the jurisdiction to decide the matter. If there is a timely and proper filing of a complaint in the Tax Court, the county board of taxation has no jurisdiction over the matter.
The statute says that a taxpayer or a taxing district “may on or before August 15 file a complaint directly with the Tax Court, if the assessed valuation of the property subject to the appeal exceeds $750,000____” N.J.S.A. 54:3-21. The statute does not say that a taxpayer or taxing district may file with the court only if there has not been, or will not be, a filing with the county board of taxation. In addition, the whole thrust and purpose of this section of the statute is to expedite the appeal process and to simplify it for the parties by eliminating preparation for, and participation in, two trials when an assessment exceeds $750,000, if either the taxpayer or the taxing district chooses to file a direct appeal.
In Union City Associates, the Supreme Court noted the possible confusion because the original assessment, on the direct appeal, and the county board judgment, on appeal to the *577 Tax Court, are both entitled to a presumption of correctness. Of course, that concern is present whether the same party files in both forums or each party files in a different forum. The concern is disposed of by following the unconditional wording of the statute and requiring the parties to proceed in the Tax Court if a direct appeal is filed with the Court.
The municipality’s argument is therefore rejected for three reasons. First, the county board judgment is not an administrative correction of the original assessment. It is a determination made by the county board of taxation in the performance of its quasi -judicial responsibilities following the filing of a petition of appeal with it and long after the assessor’s books were certified and not susceptible to change except by judgment. “[I]n hearing tax appeals, county boards are administrative agencies that exercise quasi -judicial jurisdiction.” Union City Associates, supra, 115 N.J. at 22, 556 A.2d 769 (quoting from Vicari v. Bethlehem Township, 8 N.J. Tax 513, 518 (1986) which cited N.J.S.A. 54:3-1 to -31).
Second, once a complaint by way of direct appeal is filed with the Tax Court, the county board of taxation no longer has jurisdiction over the subject matter of the petition of appeal filed before it.
Third, the law is clear that the original assessment and not the county board judgment is to be used when considering a taxpayer’s claim for discrimination relief under chapter 123. Rumson v. Haran, supra, 3 N.J. Tax at 595. This result has been consistently followed in the Tax Court. Rumson v. Peck-ham, 7 N.J. Tax 539, 553 (Tax Ct.1985); Ewing Tp. v. Suburban Square Assoc., 7 N.J. Tax 263, 274 (Tax Ct.1985); Briskin v. Atlantic City, 6 N.J. Tax 187, 194 (Tax Ct.1983); and Jefferson House Investment Co. v. Chatham, 4 N.J. Tax 669, 680 (Tax Ct.1982).
Filing in one forum or another will impact on the burden of proof and the presumption of correctness. Concern about these items, when compared to the purpose of the direct appeal statute, amounts to nothing more than “legal gamesmanship *578 which cannot be condoned by this court.” Weyerhaeuser Co. v. Borough of Closter, 190 N.J.Super. 528, 543, 464 A.2d 1156 (App.Div.1983).

Valuation.

The appraiser for the taxpayer valued the property by the cost and income approaches. He testified that both of these approaches were applicable because the improvements were relatively new and the property was held for income-producing purposes. The value of the property by the cost approach was $6,770,000. The value of the property by the income approach was $6,005,000. The witness said that, after consideration of both approaches, it was his opinion that the subject property had a value of $6,300,000 as of October 1, 1988 for the tax year 1989.
The municipality’s appraiser similarly valued the property by the cost and income approaches. By the cost approach, the property had a value of $8,733,000. By the income approach, the property had a value of $8,531,600. After reconciling the two approaches, he concluded that the property had a value of $8,600,000 as of October 1, 1988.
In valuing real property for local property tax purposes, the cost approach is an acceptable approach to value when the other approaches cannot be sustained. Coca-Cola Bottling Co. of N.Y. v. Neptune Tp., 8 N.J. Tax 169, 176 (Tax Ct.1986); Pennwalt Corp. v. Holmdel Tp., 4 N.J. Tax 51 (Tax Ct.1982); ITT Continental Baking Co. v. East Brunswick Tp., 1 N.J. Tax 244 (Tax Ct.1980). The cost approach is certainly a valid approach to the value of real property when the improvements to be valued are relatively new. However, if there is sufficient, credible evidence on the basis of which value can be found by the income approach, it is the preferable approach when valuing income-producing property. “The income capitalization approach is typically used in market value appraisals of income producing property.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at *579 411. To the same effect is Ft Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 227, 417 A.2d 1124 (App.Div.1980) (The income approach “is ‘[t]he preferred valuation method for apartment buildings ... since investors purchase apartment buildings as income-producing properties.’ ”) and G & S Co. v. Eatontown, 2 N.J. Tax 94 (Tax Ct.1980).
Given the stipulations in this matter, the income approach may be used to value the subject property upon the resolution of the differences of opinions between the two experts relating to economic rent, the vacancy factor and the expense items of janitorial services, water, repairs and maintenance, reserves for replacements, management fee and commissions on rentals.
Taxpayer’s expert was of the opinion that economic rent for the subject property as of October 1, 1988 was $16.50 a square foot, plus payment of electricity by the tenant for its rented space. His opinion of economic rent was based on the scheduled rent in four leases in the subject premises and five leases in comparable office buildings.
The municipality’s appraiser concluded that economic rent as of October 1, 1988 was $18.58 a square foot. In arriving at his opinion of economic rent, he relied on the actual scheduled rents for the subject building as of October 1, 1988. To that scheduled rent he added the actual additional paid rent for 1989 based on escalation clauses in the subject property’s leases. If, however, one uses the actual additional rent for 1988, the indicated rent is $18.40 a square foot. Subtracting $.75 a square foot for rent concessions as calculated by taxpayer’s appraiser results in an economic rent of $17.65 a square foot. It is necessary to consider rent concessions in arriving at economic rent. River Office Equities v. Middletown Tp., 11 N.J. Tax 404, 409 (Tax a.1990).
On the other hand, if one takes the taxpayer’s economic rent of $16.50, which allows for the concessions, and adds $1.85 a square foot for additional rent, the economic rent is $18.85 a square foot. The higher economic rent of the taxpayer, based on four leases in the subject property and five leases in a *580 comparable office building, will be used. Similarly, the taxpayer’s higher vacancy factor of 5% will be allowed.
A comparison of the other items in dispute may be summarized as follows:
[[Image here]]
Both appraisers made an analysis of actual operating expenses in the subject property with a view to stabilizing expenses. The appraiser for the taxpayer considered the expenses for 1985, 1986, 1987, 1988 and 1989. The municipality’s appraiser analyzed the expenses for the years 1984, 1985, 1986, 1987 and 1989. For reasons which were not altogether clear, the expenses for 1988 were not available even to the taxpayer’s expert at the time that he prepared his appraisal and were similarly not available to the municipality’s expert. However, at the time of trial, I permitted the taxpayer’s expert to testify as to the 1988 expenses. Based on the analysis made by both appraisers, and with the additional evidence before the court relating to the calendar year 1988, I accept the taxpayer’s appraiser’s opinion that the expense for janitorial services is $55,659 and for water is $23,811. However, given the differences in the amounts expended each year for repairs and maintenance, in the interest of stabilizing expenses, I find that the correct amount for repairs and maintenance is $33,762.[2]
*581 The municipality’s appraiser testified that, since the taxpayer did not actually set aside funds each year to replace building components, a reserve for replacements as an expense item was not proper. The taxpayer’s appraiser, on the other hand, deducted $36,134 as an expense item for reserve for replacements. He did this based on his analysis of three components of the building whose life expectancy is less than the economic life of the structure. His analysis may be summarized as follows:
[[Image here]]
The sum of $36,134 is at least the correct amount to be used for reserve for replacements.
The approach of the taxpayer’s appraiser is correct and an expense for reserve for replacements will be allowed in the amount of $36,134. Replacement reserves, or replacement allowances, provide for the periodic replacement of components that wear out more rapidly than the building itself and must be replaced periodically during the building’s economic life. These components would certainly include the roof, the HVAC system and the parking areas. It is not necessary that the funds be actually set aside in order that a reserve for replacements be recognized as an expense. It is, however, necessary to recog *582 nize the anticipated expense of replacing components of a building and to spread that expense over the life of the component. This is proper appraisal practice and results in greater stability of tax assessments. Otherwise, large expenses for replacement of building components would be reflected in the year of replacement causing severe swings in net income and hence in property values used for local property tax assessment purposes. River Office Equities v. Middletown Tp., supra, 11 N.J. Tax at 411-412.
In dealing with the remaining two items in dispute, management and commissions, the municipality’s expert indicated that a management fee of 3% of effective gross income was proper and that no allowance should be made for commissions. It was his opinion that management included the services necessary to rent the office space and that a separate item for commissions was not proper. However, of the four leases in the subject property listed by the taxpayer’s appraiser, two were procured through the efforts of brokers to whom commissions of 5% were paid. Of the five leases in comparable office buildings, three involve commissions to brokers, two in the amount of 4% and one in the amount of 7%. Based on the description of the rental market given by the taxpayer’s appraiser, I find that a commission allowance as an expense or a reduction in the amount of rental income actually received is proper, and I will allow a commission expense of 4% of effective gross income. While both appraisers agree that an expense item for management is appropriate, they disagree on the amount. A careful analysis of the testimony indicates that a management fee of 5% of effective gross income is proper, and such an expense will be allowed.
Accordingly, the properly reconstructed operating statement for the subject property as of October 1, 1988 for the tax year 1989 is as follows:
*583 [[Image here]]
This net operating income indicates a value of $7,066,310 when capitalized at 12.06%.

Conclusion.

The value of the subject property is $7,066,310, and the ratio of the assessed value, $6,074,100, to the true value ($6,074,100/ $7,066,310) is 85.60%. Since the chapter 123 ratio for the municipality for 1989 is 52.34%, the ratio for the subject property exceeds the upper limit of the common-level range which is 60.19%. Accordingly, the total assessment for the subject property for 1989 is $3,698,500 (rounded; $7,066,310 X 52.34%).
The allocation between land and improvements is strictly administrative, and I will use the original land assessment for judgment purposes. The Clerk of the Tax Court will enter a judgment that the assessment for the subject property for 1989 is as follows:
*584 [[Image here]]

 The case should not have been scheduled for trial before April 1, 1990. N.J.S.A. 54:51A-2. It was tried on March 9 and 14, 1990 without objection from the municipality.

 This determination is based on the annualized expenses for 1989, the information presented to the court being only for ten months, and involves an analysis of the expenses for the years 1986, 1987, 1988 and 1989.