CRABTREE, J.T.C.
Plaintiff seeks direct review pursuant to N.J.S.A. 54:3-21 of the 1993,1994 and 1995 local property tax assessments on its property located at 900 Passaic Avenue, East Newark, New Jersey (Block 12, Lot 1, Block 13, Lot 2, and Block 17, Lot 1). The assessments, the same for all years, were:
Block 12, Lot 1 Block 13, Lot 2 Block 17, Lot 11
Land $2,000,000 $266,700 $591,500
Impts. 5,337,800 -0- 77,900
Total $7,337,800 $266,700 $669,400
*570 The cases have been consolidated for trial, briefs and decision.
At issue are the true value of the subject property and whether either party is entitled to relief from a discriminatory assessment pursuant to N.J.S.A. 54:51A-6, commonly referred to as chapter 128.
The general average ratios, and the upper and lower limits of the common level range, as determined by the Director, Division of Taxation, pursuant to N.J.S.A. 54:l-35b, for defendant taxing district for the years under review were:
Average Ratio Upper Limit Lower Limit
1993 47.16% 54.23% 40.09%
1994 49.28% 56.67% 41.89%
1995 51.19% 58.87% 43.51%
The subject parcels are all contiguous and form a single economic unit.
The subject of the controversy is an aggregation of buildings, most of which are multistory, brick mill-style structures, erected in the late 1800s and early 1900s. Plaintiff’s expert counts 71 buildings; defendant’s expert lists 38 buildings. The actual number depends upon whether one counts some of the smaller structures as single buildings. In any event, the precise number is not material, as both experts agree that the total leasable space in the aggregation of improvements amounts to 1,133,775 square feet.
The property is sited on 13.45 acres. Block 12, Lot 1, containing 12.5 acres, has virtually all the leasable improvements. Block 13, Lot 2, containing 1-.6 acres, is improved only with macadam paving and is used as a parking lot. Block 17, Lot 1, containing 1.35 acres, is also used as a parking lot. It is improved not only with macadam paving, but also with fencing, bulkheads along the Passaic River and two shed buildings.
The majority of the leasable space is utilized for light manufacturing, with the remainder devoted to office, outlet retail, storage and warehousing. One building houses a gym and health club.
*571 The total leasable area of 1,183,775 square feet includes 28,000 square feet of basement area, 318,575 square feet of first floor space, 237,200 square feet of second floor space, 188,000 square feet of third floor space, 188,000 square feet of fourth floor space and 174,000 square feet of fifth floor space.
The total leased area ranged from a low of 733,775 square feet in 1993 to a high of 959,175 square feet in 1994. All leases in the subject property are gross, and most of the longer term leases call for the payment by the tenant of taxes in excess of the base year taxes (“the tax stop”). Most of the leases also require expense pass-throughs for water, electricity, gas, oil and other expenses. In addition to the expense pass-throughs, the landlord sells water and electricity to the tenants. Also, the landlord derives income from parking and land rent, items which amount to an additional $67,500 of annual income from the property.
The additional income realized by the property owner from parking, miscellaneous tenant pass-throughs, electricity charges, water charges, operating expense pass-throughs and tax passthroughs amounted to $1,649,359 for 1991 ($1.78 x 927,175 square feet), $1,545,802 for 1992 ($1.89 x 818,775 square feet), $1,199,413 for 1993 ($1.63 x 733,775 square feet), and $1,023,725 for 1994 ($1.07 x 959,175 square feet).
There were 56 leases in the subject property, exclusive of the land and parking leases. All of those fifty-six leases were executed between 1991 and 1995, with ten leases executed in 1995. Seventeen of the fifty-six leases were so-called step leases, ie., they called for increases in the rent, other than cost-of-living increases, at one or more times during the life of the lease. Of the thirty-five leases executed between 1992 and 1994, fourteen were of the step variety.
The expenses in the subject property were relatively stable. In the three pre-tax years, 1992, 1993 and 1994, the expenses per square foot of leased area were, respectively, $1.33 (818,775 square feet of leased area), $1.61 (733,775 square feet of leased area), and $1.21 (959,175 square feet of leased area). The actual expenses for those years, exclusive of property taxes, depreciation and debt *572 service, were $1,089,987 for 1992, $1,180,641 for 1993 and $1,160,-137 for 1994.
The actual vacancy in the subject property, in terms of leasable area, was 27.78% for 1992, 35.28% for 1993, and 15.40% for 1994.
Plaintiff’s expert estimated the true value of the subject property to be $8,000,000 on October 1, 1992, for tax year 1993, $7,900,-000 on October 1, 1993, for tax year 1994, and $7,900,000 on October 1,1994, for tax year 1995. In developing these estimates, he relied upon the income and sales comparison approaches to value, placing principal reliance upon the former.
The expert analyzed the leases in force on each of the five floors throughout the subject property. From this analysis he arrived at an estimate of economic rent for each floor. He concluded that the 28,000 square feet of basement space could be rented for $2.00 per square foot, although there were no leases of basement space. On the basis of his analysis of the leases in place on the five floors and his estimate of the rental applicable to the basement space, he arrived at estimates of economic rent[1] for all years under review as follows:
LEVEL AREA (SF) UNIT RENTAL RENTAL
Basement 28,000 $2.05 $ 57,400
First Floor 318,575 $3.90 $1,242,443
Second Floor 237,200 $3.05 $ 723,460
Third Floor 188,000 $3.05 $ 573,400
Fourth Floor 188,000 $3.05 $ 573,400
Fifth Floor 174,000 $2.80 $ 487,200
Total 1,133,775 $3.23 $3,657,303
To the foregoing, he added an amount for land leases of $67,400, for a total of $3,724,703, in potential gross income. In arriving at his estimates of economic rent for each floor, he used only the first year’s rent, ignoring the increases in the step leases.
*573 He calculated a vacancy and loss allowance of 20.99%. In arriving at this conclusion, he analyzed the actual vacancies, which averaged 24.06% on an unweighted basis, over a four-year period (1991 through 1994), and concluded that what he termed a weighted average of 20.99%, derived from the actual vacancy level of each floor (including the basement and land leases), was the appropriate vacancy and loss allowance. Nowhere in his analysis does he define the vacancy and loss allowance in terms of the long-term quality and durability of the income stream.
He calculated the actual income derived from the charges for sales of water and electricity and parking rentals, and averaged such income over the years 1991 through 1994, inclusive. The total of such averaged income items for those four years was $323,141, which he stabilized for all years under review at $350,-000. He included no income from expense pass-throughs or tax stops.
He analyzed the operating expenses for the years 1991 through 1994, inclusive, and concluded that the four-year average was $1.60 per square foot. He then added a management fee of 5% of effective gross income, a leasing commission of 5% of effective gross income, and reserves of 1% of effective gross income. These additions to the operating expenses, as reported on plaintiffs operating statements, brought the total expenses to $1.91 per square foot, or $2,205,554.
Finally, the expert posited a capitalization rate of 11.11%, exclusive of the effective tax rate. He developed his capitalization rate by use of the band of investment/mortgage equity technique, assuming, in this regard, a 70% mortgage position, a 10% interest rate, an amortization period of 20 years (resulting in a mortgage constant of 11.58%), a 30% equity position and a 10% equity dividend rate. To the capitalization rate thus derived, he added the effective tax rate for each year under review, namely, $2.50 for 1993 (actual rate of $5.31 x the average ratio of 47.16%), $2.67 for 1994 (actual rate of $5.41 x the average ratio of 49.28%), and $2.72 for 1995 (actual rate of $5.32 x the average ratio of 51.19%).
*574 Thus, his conclusions can be schematically represented as follows:
Year Net income Cap. rate Value
1939 $1,087,493 13.61% $7,990,397
1994 $1,087,493 13.78% $7,891,821
1995 $1,087,493 13.83% $7,863,290
The expert rounded the value to $8,000,000 for 1993, and $7,900,000 for both 1994 and 1995.
For his sales comparison approach, the expert relied upon four sales of industrial property, two in Harrison, an adjoining municipality, one in Jersey City and one in Elizabeth. Three of the sales occurred in 1994, and one in 1996. The unit sales prices ranged from $7.23 per square foot, land and building merged, to $8.79 per square foot, land and building merged. The sale properties were all significantly smaller than the subject, both in land area and in the size of the improvements. The expert made net adjustments of 3% for the Jersey City property, 9% for the Elizabeth property, 23% for one of the Harrison properties and 15% for the other Harrison property. His gross adjustments, disregarding the pluses and minuses, were 57% for the Jersey City property, 29% for the Elizabeth property, 53% for one Harrison property and 45% for the other Harrison property. His estimate of value under the sales comparison approach was $7,500,000 for all three years. In reconciling the two approaches to value, he arrived at the aforementioned values, developed under the income approach, of $8,000,000 for 1993 and $7,900,000 for each of the years 1994 and 1995.
Defendant’s expert, relying exclusively on the income approach to value, estimated the stabilized true value of the subject property to be $15,827,000 for all three years under review.
The expert estimated economic rent at $3.50 per square foot for all leasable space, without distinction, on the basis of floor levels. In reaching this conclusion, he relied upon the leases in the subject property, as well as the rent payable under five allegedly comparable leases. In evaluating the leases in the subject, he *575 took into account those leases which called for step increases during the lease term. The comparable leases, which involved four properties in Jersey City and one property in Bogota, reflected average rentals of $3.69 per square foot. Those leases were executed in 1990,1991,1992,1993 and 1994.
He accounted for the additional income derived from passthroughs, tax stops and sales of water and electricity, by assigning $0.50 per square foot to the entire leasable area of 1,133,775 square feet, adding the annual land rents and parking rents of $67,500 and $20,000, respectively. From the potential gross income thus determined, he subtracted 15% as a vacancy and loss allowance.
Then he posited expenses for management (5%), leasing commissions (3%), repairs (2%), maintenance (2%), reserves (2%), and additional expenses of $1,307,007, based on a stabilized leased area of 963,709 square feet ($1.35 per square foot). After subtracting all expenses, as aforesaid, to arrive at net operating income, he posited a capitalization rate of 10.5% for all three years under review, adding the average effective tax rate for all three years. Like plaintiffs expert, defendant’s expert used the band of investment/mortgage equity technique, assigning a mortgage position of 70% and an equity position of 30%. He assumed a mortgage interest rate of 9% and an amortization period of 20 years, with a resulting constant of 10.79%. He assumed an equity dividend rate of 10%.
The expert’s conclusions can be schematically represented as follows:
Gross income 1.133.775 sf X $3.50/sf $3,968,213
Additional income 1.133.775 sf x $0.50/sf 566,888
Plus parking income 20,000
Plus land rent 67,500
Total gross income $4,622,600
Less vacancy and loss allowance (15%) 693,390
Effective gross income $3,929,210
*576 Less expenses:
Management (5%) $ 196,461
Leasing commissions (3%) 117,876
Repairs (2%) 78.584
Maintenance (2%) 78.584
Additional expenses:
$1.35/sf of leases area 1,301,007
Reserves (2%) 78.584
Total expenses $ 1,851,096
Net operating income $ 2,078,114
Capitalized at 13.13%:
10.5% plus average effective tax rate of 2.63%
True value (rounded) $15,827,000
Both experts agree that the subject is an income-producing property, and it is well settled in this State that the income approach is the preferred method of valuing such property for property tax purposes. Parkway Village Apartments Co. v. Cranford Tp., 108 N.J. 266, 270, 528 A.2d 922 (1987); Helmsley v. Fort Lee Bor. 78 N.J. 200, 213-14, 394 A.2d 65 (1978), appeal dismissed, 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979); Parkview Village Assocs. v. Collingswood Bor. 62 N.J. 21, 23, 297 A.2d 842 (1972); Fort Lee Bor. v. Hudson Terrace Apartments, 175 N.J.Super. 221, 227, 417 A.2d 1124 (App.Div.), certif. denied, 85 N.J. 459, 427 A.2d 559 (1980). I have considered the sales comparison approach utilized by plaintiff’s expert, and I find that that approach is simply not probative of the subject’s true value. To begin with, of the four sale properties proffered as comparable, one of them was adjusted by 57% (Sale # 1), a second was adjusted by 53% (Sale # 2), and a third was adjusted by 45% (Sale # 4). These adjustments were gross, ie., the fact that they were either positive or negative has been disregarded. Adjustments of these magnitudes have been held to vitiate comparability. M.I. Holdings, Inc. v. City of Jersey City, 12 N.J.Tax 129, 137 (Tax 1991); Owens-Illinois Glass Co. v. Bridgeton, 8 N.J.Tax 495, 512 (Tax 1986). Also, the sale properties appear to have been fully or *577 partially tenanted at the times of the sales. Thus, the sale price cannot be relied upon as an indicator of value absent proof of income and expenses and vacancies. The circumstances are similar to the use of the market data approach in valuing shopping centers. This court has held that the sales comparison approach is not probative of the true value of a shopping center absent detailed information as to the income from the allegedly comparable shopping centers. Gabrellian & Jessourian Assocs. v. Oakland Bor., 11 N.J.Tax 310, 315 (Tax 1990). Thus, there is no way this court could evaluate the comparability of the sale properties absent detailed evidence concerning the income and expenses of those properties. Cf. WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J.Tax 610, 624 (Tax 1985), aff'd o.b. per curiam, 9 N.J.Tax 86 (App.Div.1986) (finding sale price of allegedly comparable property could have reflected burden of non-economic lease, thereby precluding use of the sale as a reliable indicator of value). It is well settled that allegedly comparable properties must bear sufficient similarity to the subject so as to admit of reasonable comparison. Phillips v. Hamilton Tp., 15 N.J.Tax 222, 227 (App.Div.1995); Glenpointe Assocs. v. Teaneck Tp., 241 N.J.Super. 37, 48, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990); Bloomfield Assocs. v. Town of Bloomfield, 12 N.J.Tax 501, 510 (Tax 1992).
Both experts relied primarily upon the existing leases in the subject property for their estimates of economic rent. As all those leases were executed in reasonable proximity to the assessing dates, I find that the economic rent for all three tax years can be derived from those leases. Morris Tp. v. LF Assocs., 12 N.J.Tax 87, 100 (Tax 1991); River Office Equities v. Middletown Tp., 11 N.J.Tax 404, 409 (Tax 1990).
In developing his economic rent estimate from the leases in the subject, plaintiffs expert utilized only the first year’s rent in the multi-year leases. As set forth above, in this court’s findings, many of the leases were of the step variety, i.e., they called for a certain rent for an initial period, followed by rent increases over stated periods. Appraisal Institute, The Dictionary of Real Es *578 tate Appraisal 349 (3d ed. 1993). Defendant’s expert, on the other hand, averaged the rents payable over the life of each lease, a technique which is consistent with sound appraisal principles.
Value is created by the anticipation of future benefits. Appraisal Institute, The Appraisal of Real Estate 35 (11th ed. 1996). The value of income-producing real estate is based on the income it will produce in the future. Id. Failure to consider future income contradicts the principle of anticipation, ie., the present worth of future benefits. Id. at 471. The ultimate concern is the future, and while current income is a good starting point, the direction and expected rate of income change are critical to the capitalization of income as a valuation approach. Id.
Accordingly, where income changes are known, as is the case with step-up leas'es, those increases in income, to the extent they reflect economic rent, should be reflected in the appraiser’s estimate of the property’s future income. The rationale for the step-up lease is the landlord’s willingness to accept smaller rent in the early years to assist a tenant in establishing a new business or an old business in a new location. The step-up lease may also reflect the owner’s recognition of tenant expenditures, which are, in effect, amortized over the early years of the lease when rent payments are smaller. Id. at 472.
Defendant’s expert also reflected rent concessions in his economic rent analysis, as he was required to do. Sound appraisal principles dictate that rent concessions be considered in the development of the income analysis. Id. at 474; Shav Assocs. v. Middletown Tp., 11 N.J.Tax 569, 579 (Tax 1991). Viewing the testimony and appraisals of the experts overall, the court finds the evidence of defendant’s expert to be the more persuasive on the issue of economic rent. The probative value of an expert’s opinion depends entirely on the facts and analysis offered in support of that opinion. Dworman v. Tinton Falls Bor., 1 N.J.Tax 445, 458 (Tax 1980), aff'd o.b. per curiam, 3 N.J.Tax 1 (App.Div.), certif. denied 88 N.J. 495, 443 A.2d 709 (1981). Thus, the court finds the *579 economic rent to be $3.50 per square foot for all years under review.
Defendant’s expert estimated the additional income from sales of water and electricity, tax stops and pass-throughs, to be $0.50 per square foot of leasable area on a stabilized basis. This estimate differed from the actual income derived from those sources in the years under review, but the comparison of the expert’s stabilized additional income projection with the actual income realized from the indicated sources is inapt; the actual income relates to the area actually leased in the years under review, namely, $1.78 per square foot for 927,175 square feet leased in 1991, $1.89 per square foot for 818,775 square feet leased in 1992, $1.63 per square foot for 733,775 square feet leased in 1993, and $1.07 per square foot for 959,175 square feet leased in 1994. Plaintiffs expert used the actual average income derived from parking and sales of water and electricity for the years 1991 through 1994 to arrive at his “stabilized” estimate of $350,000 of additional income for each year under review. He failed to account for tax stops and other expense pass-throughs; he used the actual income derived from parking and sales of water and electricity, even though such actual income came from occupancies of 81.78% of leasable area in 1991, 72.22% in 1992, 64.72% in 1993, and 84.60% in 1994. Obviously, he made no effort to stabilize the additional income for the years under review on the basis of total leasable area. His alleged “stabilization” of the parking and water and electricity income was simply an averaging. The concept of stabilization, it must be pointed out, involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property. The Dictionary of Real Estate Appraisal, supra, at 344-45.
Defendant’s expert, consistent with the principles of stabilization, estimated that the pass-throughs would not continue at the levels prevailing during the tax years and that accordingly, the owner would be picking up more of the expenses. On this basis, the expert posited a stabilized level of additional income at $0.50 *580 per square foot for the entire leasable area, leaving it to the vacancy and loss allowance to account for the loss of additional income for vacant areas.
The experts are in virtual agreement on the parking and land rent income. Plaintiffs expert uses the four-year average of $22,019 for parking income and $67,400 for land rent. Defendant’s expert posits $20,000 for parking income on a stabilized basis and $67,500 for land rent for each year under review. I find that the parking income for each year before the court is $20,000, and land rent for each such year is $67,500.
As for the vacancy and loss allowance, plaintiffs expert appeared to rely primarily upon the vacancy history in the subject, analyzing the actual vacancy rates by floors and by years. While he refers to his vacancy allowance as a stabilized figure, it appears to be an averaged amount. The most critical shortcoming, however, is his failure to project a vacancy and loss allowance over the economic life of the property, using, in some measure, the actual history, but placing more emphasis on the trends in the most recent years-. For example, the actual vacancy rate for 1994 was 15.79%, a significant reduction from the vacancy for the prior year of 32.08%. The important principle implicated in the estimate of a vacancy and loss allowance is that the estimate is simply the appraiser’s informed judgment of the long-term quality and durability of the income stream. University Plaza Realty Corp. v. City of Hackensack, 12 N.J.Tax 354, 369 (Tax 1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. denied, 134 N.J. 481, 634 A.2d 527 (1993); RTC Properties v. Town of Kearny, 13 N.J.Tax 146, 154 (Tax 1993).
I find the vacancy and rent loss allowance to be 15%, the amount estimated by defendant’s expert.
As for expenses, the experts agree upon a management fee of 5% of effective gross income and 2% of effective gross income for reserves and miscellaneous. Plaintiff’s expert posits leasing commissions of 5% of effective gross income, while defendant’s expert assumes a 3% leasing commission. The experts differ significantly on repairs and maintenance and all other expenses.
*581 The leasing commissions posited by defendant’s expert are supported by the history of the property. Over the years, especially since 1990, only 24% to 28% of the buildings in the subject complex have been leased through a broker. Prospective tenants have frequently gone to the building’s manager, a sales office on the premises, or a building superintendent’s office. Accordingly, I find that the appropriate expense for leasing commissions is 3% on a stabilized basis.
Plaintiff’s expert’s analysis of other expenses is fatally flawed in two significant respects, both related to the concept of stabilization. First, he averages expenses over a four-year period; this, as I pointed out earlier, does not constitute stabilizing. Secondly, the repair expense of $735,385 incurred in 1991 is atypical when considered with the repair expenses for the three subsequent years. This extraordinarily large expense must be adjusted to reflect a stable annual expense consistent with the principle of stabilization. The Dictionary of Real Estate Appraisal, supra, at 344-45. As Judge Andrew observed in Parkway Village Apartments Co. v. Cranford Tp., 8 N.J.Tax 430 (Tax 1985), aff'd, 9 N. J.Tax 199 (App.Div.1986), rev’d on other grounds, 108 N.J. 266, 528 A.2d 922 (1987):
It is clear that an appraiser’s function is to reconstruct a yearly pattern of expenses.
Expenses vary from year to year, and it is important to review operating statements for three or more years in order to determine whether certain expenses are typical or atypical. [The petitioner’s expert] did not review the owner’s statements for 1979 to 1981 while [the municipality’s expert] did. [The municipality’s expert’s] estimate better reflects the patterned expense to be anticipated by the potential purchaser.
[8 N.J.Tax at 444 (citations omitted).]
The expense analysis of defendant’s expert is consistent with the appraisal principles declared in the appraisal text and Tax Court cases cited above. The analysis of plaintiffs expert is not. Defendant’s expert stabilized all expenses, with particular emphasis on the extraordinary repair expense for 1991. His stabilization led him to a stabilized repair expense of 2% of effective gross income and a like amount for maintenance. He also estimated all other expenses (except for management, leasing commissions and *582 reserves) at $1.35 per square foot of leased area. To be consistent with the treatment of income, including additional income, he should have applied the expense estimate to the entire leasable area, not just the average leased area, but discounted for the vacancy factor.
I find that defendant’s expert is more persuasive on all expense issues, and I find those expense projections to be appropriate. Except for the reasons indicated, I will apply the $1.35 per square foot expense to 85% of the entire leasable area.
' In view of the foregoing, I find the net operating income for all years under review to be $2,078,115, calculated as follows:
Potential gross income:
1.133.775 sf x $3.50 $3,968,213
Additional income from pass-throughs and sales of water and electricity 1.333.775 sf x $.50 566,888
Plus parking income 20,000
Plus land rent 67,500
Total gross income $4,622,600
Less vacancy and rent loss (15%) (693,390)
Effective gross income $3,929,210
Expenses:
Management (5%) $196,461
Commissions (3%) 117,876
Repairs (2%) 78.584
Maintenance (2%) 78.584
Additional expense:
963,708 sf (85% of total
leasable area) x $1.35 $1,301,006
Reserves (2%) 78,584
Total expenses 1,851,095
Net operating income $2,078,115
As for the capitalization rate, the-experts agree upon all components except the mortgage interest rate. Plaintiffs expert posits a 10% interest rate. Defendant’s expert assumes a 9% interest *583 rate. The difference is a mere 70 basis points.[2] On balance, and taking into account the age of the subject, I conclude that a 10% mortgage interest rate is appropriate.
Also, defendant’s expert, in the guise of stabilization, averages the effective tax rate. I find this to be inappropriate. The putative investor considers the level of taxes on each valuation date in deciding what he is prepared to pay for the property. Thus I will apply the effective tax rate for each year in arriving at a conclusion of true value.
As stated above, I find that the net income to be capitalized for all years under review to be $2,078,115. The capitalization rate for 1993 is 13.61%, including an effective tax rate of $2.50. The capitalization rate for 1994 is 13.78%, including an effective tax rate of $2.67. The capitalization rate for 1995 is 13.83%, including an effective tax rate of $2.72.
Thus, I find the true value of the subject property to be $15,269,000 (rounded) for 1993, $15,069,700 (rounded) for 1994, and $15,026,100 (rounded) for 1995.
The ratios of assessment to true value are 54.19% for 1993, 54.90% for 1994, and 55.06% for 1995.
As these ratios all fall within the common level range, judgments will be entered affirming the assessments for all three years under review.

 The expert’s economic rent estimate includes $.05 per square foot for sprinkler and drinking water charges.

 Both experts ascribe a 70% position to the mortgage component. Thus, the weighted difference in their positive mortgage interest rates is 70 basis points (70% of 1%).