**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

June 1, 2023

Amber N. Heinze, Esq.
Heinze Law, P.A.
383 Main Street, Suite 101
Chatham, New Jersey 07928

Dominic DiYanni, Esq.
Eric M. Bernstein & Associates, LLC
34 Mountain Boulevard, Building A
Warren, New Jersey 07059-4922

> Re: AG Kings Montclair LLC v. Montclair Township
> Docket Nos. 005317-2018, 003518-2019, 002133-2020, and 005949-2021

Dear Ms. Heinze and Mr. DiYanni:

This letter constitutes the court's opinion following trial of above local property tax appeals. AG Kings Montclair LLC ("AG Kings") challenges the 2018, 2019, 2020, and 2021 local property tax assessments on its improved property in Montclair Township ("Montclair"), Essex County, New Jersey.

For the reasons stated more fully below, the court reduces the 2018, 2019, 2020, and 2021 tax year assessments.

## I. Procedural History and Findings of Fact

Pursuant to R. 1:7-4, the court makes the following factual findings based on the evidence and testimony introduced during trial.

As of the valuation dates at issue, AG Kings was the owner of the real property and






improvements located at 644 Valley Road, Montclair, Essex County, New Jersey.[1] The subject property is identified on Montclair's municipal tax map as block 1810, lot 9 (the "subject property").

The subject property is improved with a one-story masonry building comprising approximately 17,772 square feet (including a mezzanine area[2]) on a rectangular shaped 1.473-acre site. The lot is located along the west side of Valley Road, situated between Lorraine Avenue and Jerome Place. The site contains parking for between ninety-four to one-hundred five vehicles.[3] The lot has approximately 287 feet of frontage along Valley Road and a depth of approximately 223 feet. The New Jersey Transit Commuter Rail Line borders the site's rear boundary.

The property is operated as a Kings supermarket/grocery store. The building was erected in the 1950's and is constructed on a concrete slab, having concrete block exterior walls with partial red brick covering, a false mansard roof overhand along the front elevation, a flat roof with composition and hot tar covering, and plate glass storefront windows and entrance doors. The interior is finished with vinyl tile and laminate plank flooring, sheetrock walls, suspended

---

[1] The subject property was sold by Kings Super Markets, Inc. to AG Kings Montclair, LLC on April 27, 2006, for consideration of $6,400,000. The trial record is unclear whether there was a subsequent conveyance or if AG Kings amended its name and organizational documents, however, on December 28, 2007, KSM Montclair (NJ) QRS 16-78, Inc., as landlord, and Kings Super Markets, Inc., as tenant, executed a Lease for the subject property ("Lease"). On April 3, 2017, KSM Montclair (NJ) QRS 16-78, Inc., as landlord, and Kings Super Markets, Inc., as tenant, executed a First Amendment to Amended and Restated Lease Agreement for the subject property ("First Amendment to Lease").

[2] AG Kings' expert (as defined herein) testified that the mezzanine area comprises approximately 576 square feet. Montclair's expert (as defined herein) testified that the mezzanine area comprises approximately 726 square feet. However, this minor disparity in mezzanine area does not affect the court's determination of true or market value.

[3] AG Kings' expert (as defined herein) testified that the parking area accommodates ninety-four vehicles. Montclair's expert (as defined herein) testified that the parking area accommodates one-hundred and five vehicles.






acoustical tile ceiling with recessed florescent lighting, cooler display units, bakery ovens, service counters, numerous coolers and walk-in box units for dairy, meat, deli, seafood, etc. areas, a mezzanine area with two offices, an associate's lounge with men's and women's lockers and bathrooms, a storage and loading area, and two loading doors. Package HVAC units are mounted on the roof. The building has two entrances, one along the south side of the building and one along the north side of the building. The site is serviced by public utilities, including municipal sewer and water, natural gas, and electric.

The subject property is in Flood Hazard Area X, denoting an "area[] of minimal flood hazard."[4]

The subject property is in Montclair's N-C Neighborhood Commercial zoning district with permitted principal uses that include mixed use residential/nonresidential buildings with a maximum density of 28 units per acre, retail stores, personal service establishments, restaurants, business and professional offices, medical offices, banks, educational play centers, churches, charitable institutions, and municipal facilities.

AG Kings timely filed complaints challenging the subject property's 2018, 2019, 2020, and 2021 tax year assessments. Montclair filed counterclaims for the 2019, 2020, and 2021 tax years. The court tried the matters to conclusion over two days.

During trial, AG Kings and Montclair each offered testimony from a New Jersey certified general real estate appraiser, who the court accepted as experts in the field of real property valuation.[5] Each expert prepared an appraisal report containing photographs of the subject property and expressing opinions of the subject property's true or fair market value. As of each

---

[4] https://www.fema.gov/glossary/flood-zones.
[5] AG Kings and Montclair stipulated to the qualifications of each appraiser as an expert witness.






valuation date, the subject property's local property tax assessment, implied equalized value, and

the experts' value conclusions are set forth below:

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | AG King's expert | Montclair's expert |
|---|---|---|---|---|---|
| 10/1/2017 | $6,150,400 | 100% | $6,150,400 | $4,400,000 | $6,465,000 |
| 10/1/2018 | $6,150,400 | 90.23% | $6,816,358 | $4,400,000 | $6,295,000 |
| 10/1/2019 | $6,150,400 | 89.51% | $6,871,188 | $4,400,000 | $6,200,000 |
| 10/1/2020 | $6,150,400 | 88.05% | $6,985,122 | $4,400,000 | $6,735,000 |

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142






N.J. 520 (1995)). The evidence presented, when viewed under the <u>Brill</u> standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" <u>West Colonial Enters, LLC v. East Orange City</u>, 20 N.J. Tax 576, 579 (Tax 2003) (quoting <u>Lenal Properties, Inc. v. City of Jersey City,</u> 18 N.J. Tax 405, 408 (Tax 1999), <u>aff'd</u>, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" <u>Greenblatt v. Englewood City</u>, 26 N.J. Tax 41, 52 (Tax 2011) (quoting <u>Rodwood Gardens, Inc. v. Summit City</u>, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under <u>R.</u> 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of validity. If the court concludes that a challenging party has not carried its burden, dismissal of the action is warranted under <u>R.</u> 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, affording AG Kings all reasonable and legitimate inferences that could be deduced from the evidence presented, the court finds that AG Kings produced cogent evidence sufficient to overcome the presumption of validity. The opinions of AG Kings' expert, if accepted by the court as true, raise debatable questions as to the validity of the subject property's tax assessments.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." <u>Ford Motor Co. v. Edison Twp.</u>, 127 N.J. 290, 312 (1992). The court must be mindful that "although






there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

### B. Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use analysis is a concept rooted in the market's perceptions of value because it answers the inquiry, "[w]hat use would the market make of that property?" Ford Motor Co., 127 N.J. at 302 (citation omitted). To accurately answer that question, an appraiser must conduct "a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." Clemente, 27 N.J. Tax at 269. Thus, the highest and best use analysis is the starting point in the court's journey to discern a property's true or fair market value. See Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis is "the first and most important step in the valuation process").

Here, both experts concluded that the subject property's highest and best use, as vacant, is for either a commercial or a commercial/residential mixed use in accordance with applicable zoning laws, and as improved, is for its present commercial use as a supermarket/grocery store. The court finds the experts' testimony credible and that the evidence supports their conclusions. Therefore, the court finds that the subject property's highest and best use, as vacant, is for a commercial or commercial/residential mixed use in accordance with applicable zoning laws, and as improved, for its present commercial use as a supermarket/grocery store.






C.    Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Bor., 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Here, both AG Kings' expert and Montclair's expert concluded, and the court agrees, that the income capitalization approach is the most appropriate method to derive the subject property's estimated true or market value.

1.    Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, L.L.C. v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert[s] these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th






ed. 2013).

Fundamental to the income capitalization approach is the concept of anticipation, a process designed to forecast future economic benefits and convert those benefits into a present value estimate. Id. at 440. In essence, the income capitalization approach converts the anticipated stream of a property's income and the reversionary benefit into a present value. First Republic Corp. of Am. v. E. Newark Borough, 16 N.J. Tax 568, 578 (Tax 1997) (stating that the value of "income-producing real estate is based on the income it will produce in the future . . . the principle of anticipation, [is] the present worth of future benefits"). Thus, when valuing income-producing property, "[t]he ultimate concern is the future . . . , the direction and expected rate of income change are critical to the capitalization of income as a valuation approach." Ibid.

a.     Economic or Market Rent

In undertaking the income-capitalization approach, an appraiser is charged with the responsibility of determining a property's potential gross income. This requires an appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 270 (1987). The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010).

By accurately determining a property's economic or market rent, an appraiser can forecast the anticipated revenue stream to be generated by that property and convert that future income






stream into a present value.  First Republic Corp. of Am., 16 N.J. Tax at 578.[6]

        i.        AG Kings' expert

In performing his income capitalization approach, AG Kings' expert's appraisal report identified eight retail leases executed between January 26, 2014 and October 29, 2019.  According to AG Kings' expert, the comparable properties' sizes, uses, and locations, along with the ability to verify the lease terms were the key factors in selecting comparable retail leases.  However, after preparing his appraisal report and in preparation for trial, AG Kings' expert discovered that his comparable retail lease 1 was not an arms-length transaction.  Therefore, although contained in his trial-ready appraisal report, AG Kings' expert submitted at trial that comparable lease 1 was not representative of market or economic rent and thus, he excluded it from his trial testimony and consideration of economic or market rent.

The remaining seven retail leases were identified under AG Kings' expert's appraisal report as follows: (i) comparable retail lease no. 2 – 360-364 Centre Street, Nutley, Essex County; (ii) comparable retail lease no. 3 – 221 East Route 4, Paramus, Bergen County; (iii) comparable retail lease no. 4 – Ridgewood Avenue & Winters Avenue, Paramus, Bergen County;[7] (iv)

---

[6] AG Kings' expert and Montclair's expert each offered limited testimony regarding their review and analysis of the subject property's Lease. AG Kings' expert testified that he attempted to verify the Lease however, due to Kings Super Market, Inc.'s bankruptcy and subsequent 2020 sale to ACME Markets, Inc., he was unable to verify any information under the Lease. Cross-examination revealed that AG Kings' expert's Lease verification efforts involved inquiries only to the tenant, Kings Super Markets, Inc., representatives. AG Kings' expert did not attempt to contact any representative of the landlord, KSM Montclair (NJ) QRS 16-78, Inc. In addition, the evidence disclosed that the First Amendment to Lease is for a 361-month term and provides for annual rent from April 2006 to May 2026, of $561,227.54 or $31.58 per square foot ($561,227.54/17,7772 sq. ft. = $31.58). The annual rent is thereafter adjusted based on the Consumer Price Index. In Montclair's expert's opinion, the subject property's rent is above market or economic rental rates.
[7] During trial, AG Kings' expert testified that comparable retail lease 3 contained 5,000 square feet of basement area, and that leased area should have been used in computing its effective rent. Thus, he opined that the effective rent under lease 3 should be $20.50 per square foot.


Interpreter


ADA
Americans with Disabilities Act


ENSURING AN OPEN DOOR TO JUSTICE



comparable retail lease no. 5 – 1235 Hamburg Turnpike, Wayne, Passaic County; (v) comparable retail lease no. 6 – 560-600 Valley Road, Wayne, Passaic County; (vi) comparable retail lease no. 7 – 10 South Avenue, Garwood, Union County; and (vii) comparable retail lease no. 8 – 100 Franklin Avenue, Nutley, Essex County.

In AG Kings' expert's opinion, the effective rent of his seven comparable retail leases should be the rent ascribed only at the lease commencement date, because that is the negotiated market rent. Stated differently, AG Kings' expert did not consider any rent step-ups or rent increases payable under his comparable retail leases in discerning the effective rents. Accordingly, AG Kings' expert's appraisal report reflected effective rents ranging from $8.01 to $28.00 per square foot.[8]

However, during trial, AG Kings' expert attempted to supplement the effective or market rents identified in his appraisal report by offering testimony disclosing calculations of the "average rent" over the lease term for each of his comparable retail leases. In response to direct examination questioning, AG Kings' expert admitted that the "average rents over the term, they are slightly higher by a couple of dollars." AG Kings' expert's testimony revealed that the average rent over the lease term of the seven comparable retail leases were: (i) $15.17, comparable retail lease 2; (ii) $24.29, comparable retail lease 3; (iii) $28.70, comparable retail lease 4; (iv) $9.33, comparable lease 5; (v) $18.66, comparable retail lease 6; (vi) $17.00, comparable retail lease 7; and (vii) $8.01, comparable retail lease 8.

Next, AG Kings' expert applied location adjustments to all the comparable retail leases

---

[8] AG Kings' expert's retail lease 5 and retail lease 8 were modified gross leases. Accordingly, he deducted the real estate taxes payable from the rent payable under the lease in calculating his effective rent. The rent payable under each lease, without deduction of the real estate taxes, was $16.24 p.s.f. for retail lease 5, and $14.03 p.s.f. for retail lease 8.






(excluding comparable retail lease 6), ranging from -5% to 15%, to account for their perceived superior or inferior locations. To arrive at his location adjustments, AG Kings' expert testified that he compared the subject property's daily traffic counts to the traffic counts of the comparable retail lease locations. In addition, he compared the demographics/populations surrounding the subject property and the comparable retail leases, as well as the reported average household income of Montclair to the municipalities where each comparable retail lease is located. The resulting range of adjusted rents were $9.21 to $26.60 per square foot.

AG Kings' expert further testified that he consulted with brokers and property owners in the marketplace to attempt to discern the market rent for a "small" supermarket/grocery store. In reaching his concluded economic or market rent, AG Kings' expert testified that he considered what the comparable lease data disclosed, however, he placed the greatest weight and emphasis on what the brokers and property owners related to him would be the market or economic rent for a grocery store like the subject property. Ultimately, AG Kings' expert concluded a market rent of $22.00 per square foot for the subject property for the 2018, 2019, 2020, and 2021 tax years.

ii. Montclair's expert

In performing his income capitalization approach, Montclair's expert testified that he examined the subject property's Lease and identified six supermarket/grocery store leases executed between November 2012 and January 2017. The leases were identified under his appraisal report as follows: (i) comparable supermarket rental 1 – 500 Route 23, Pequannock; (ii) comparable supermarket rental 2 – 83 Ackerman Avenue, Clifton; (iii) comparable supermarket rental 3 – 19 Ver Valen Street, Closter; (iv) comparable supermarket rental 4 – 110 Washington Street, Morristown; (v) comparable supermarket rental 5 – 221 Route 4 East, Paramus; and (vi) comparable lease 6 – 645 Middlesex Avenue, Metuchen.






In Montclair's expert's opinion, "traditionally supermarkets . . . leases [are] of a long-term nature, somewhat longer than your typical retail lease would be, because we are not talking about a typical or conventional retail property here, we are talking about a supermarket, these leases are typically 15 to 20 years or longer with options." Thus, in calculating the effective rent for each of his six supermarket comparable rentals, Montclair's expert examined the rent payable over the entire initial lease term and ascribed an economic rental value representing the average rent over the initial lease term. The reported effective rents ranged from $23.00 to $32.49 per square foot.

Moreover, according to Montclair's expert, "the fact that these were all supermarkets . . . it's the use [that] is what is important here, you want to compare apples to apples, and that is what I was trying to do here." In Montclair's expert's opinion, because all the comparable rentals were supermarkets/grocery stores, they shared many of the same physical characteristics and features as the subject property, thus, he found no condition adjustments were warranted. In addition, Montclair's expert testified that he also considered adjustments for age, location, and size, however, based on his review of the data, no age, location, or size adjustments were warranted.

Accordingly, Montclair's expert applied no adjustments to any of his comparable supermarket rentals and concluded an economic or market rent of $26.50 per square foot for the subject property for the 2018, 2019, 2020, and 2021 tax years.

iii.     Court's analysis

At the outset, the court emphasizes that the weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates, Inc., 2 N.J. Tax at 66 (citing City of Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959)). Thus, for the opinions of an expert to be of any import, the expert is required to "identify the factual bases for their






conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). Without an adequate explanation of the basis, "the opinion of the expert is entitled to little weight. . . ." Dworman v. Tinton Falls Bor., 1 N.J. Tax 445, 458 (Tax 1980). Additionally, "this court has not only the right, but the duty, to apply its own judgment to valuation data submitted to it by experts in order to arrive at a true value and fix an assessment for the tax years in question." Lamm Associates v. Borough of West Caldwell, 1 N.J. Tax 373, 387-388 (Tax 1980) (citing Samuel Hird and Sons, Inc., 87 N.J. Super. 65).

Here, although minor disparities existed with their reported vacancy/collection loss rates and structural reserve amounts, the core issues in dispute revolve around: (i) the manner that each expert analyzed, determined, and reported the effective rent of their comparable leases, and thus, arrived at an economic or market rent; (ii) whether a tenant improvement allowance for a supermarket/grocery store was customary in the marketplace and, if so, what that tenant improvement allowance would be; and (iii) the capitalization rate that should be applied to the net operating income on the reconstructed operating statements.

a.     Effective rent and economic/market rent

Effective rent is an analytical tool employed by valuation experts to account for, compare, and contrast lease terms, rent step-up provisions, and periods of free rent afforded under comparable and competitive leases in the marketplace, to assist the expert in developing a credible economic or market rent. In sum, the calculation of "effective" rent is a mechanism that allows an appraiser to consider the rent step-ups payable under a lease, along with any financial or rent concessions afforded, in attempting to compare leases and discern economic or market rent.

The proper and accurate calculation of effective rent is pivotal when undertaking the






income-capitalization approach because it is premised on anticipation, the conversion of the anticipated future stream of revenue into a present value. As cogently explained by Judge Crabtree,

> Value is created by the anticipation of future benefits. The value of income-producing real estate is based on the income it will produce in the future. <u>Failure to consider future income contradicts the principle of anticipation</u>, *i.e.,* the present worth of future benefits. <u>The ultimate concern is the future, and while current income is a good starting point, the direction and expected rate of income change are critical to the capitalization of income as a valuation approach</u>.

> Accordingly, where income changes are known, as is the case with step-up leases, those increases in income, to the extent they reflect economic rent, should be reflected in the appraiser's estimate of the property's future income.

> [<u>First Republic Corp. of Am.,</u>16 N.J. Tax at 578 (internal citations omitted) (emphasis added).]

Although our courts have consistently found that "economic rent [must] reflect[] rent concessions," no rigid formula has been adopted delineating how "effective" rent should be calculated. <u>Glen Pointe Associates v. Teaneck Twp.</u>, 10 N.J. Tax 506, 522 fn3 (Tax 1989), <u>aff'd</u>, 12 N.J. Tax 127 (App. Div. 1991). <u>See also</u> <u>Shav Associates v. Middletown Twp.</u>, 11 N.J. Tax 569, 579 (Tax 1991) (concluding that "[i]t is necessary to consider rent concessions in arriving at economic rent").

Thus, when the marketplace demands leases contain rent step-ups, rent concessions, or other financial incentives, the valuation expert must account for these factors in attempting to discern the economic or market rent because they materially impact the property owner's anticipated future stream of income. In sum, the effective rent is intended to serve as an analytical tool enabling appraisers to weigh, distinguish, differentiate, and reconcile lease terms, step-up






provisions, and other financial concessions under comparable leases, to assist the appraiser in developing a credible economic or market rent. This analysis pays deference to the principal that under the income capitalization approach, the present value must account for the future stream of economic benefits to be received by the property owner over the anticipated lease term.

Accordingly, when a lease contains a rent escalation provision "those increases in income, to the extent they reflect economic rent, should be reflected in the appraiser's estimate of the property's future income." Ibid. The logic and rationale behind this principle is straightforward; the landlord is often willing to accept a lower rent at the outset of a lease in recognition of the expenses that the tenant will incur in establishing or relocating its business. Thus, the landlord will permit the tenant to amortize those start-up costs during the initial months or first years of the lease when the rent is lower.

Here, effective cross-examination of AG Kings' expert revealed that despite comparable retail leases 2, 3, 4, and 6 containing rent step-up provisions, the effective rent reported in AG Kings' expert's trial-ready appraisal report accounted only for the rent payable during the first lease year, without consideration of the rent increases payable over the lease term.[9] Cross-examination further disclosed that the effective rent for comparable retail leases 2, 3, 4, and 6, after consideration of the rent escalations and any periods of free rent, would have produced effective rents ranging from $15.17 to $28.70.[10]

---

[9] Comparable retail leases 5, 7, and 8 apparently did not contain a rent step-up provision.

[10] AG Kings' expert testified that upon further reflection he should have included the 5,000 square foot basement area under lease 3 in his calculation of its effective rent. Thus, he opined that, the effective rent of lease 3, over the 20-year lease term, would be $24.29 p.s.f. The court's calculation of effective rent, inclusive of the rent step-ups over the 20-year lease term produced an effective rent of $24.22 p.s.f. with the basement area, and $31.56 p.s.f without consideration of the 5,000 square foot basement area.






In AG Kings' expert's opinion, "when the lease is growing by more than the typical CPI increases, than I feel it's better to use the average [rent payable over the lease term], when the lease only goes up a certain amount, like CPI to kind of compensate for inflation, my discussions with brokers and property owners is that in those cases the first year rent is really what the meeting of the minds is and that more is reflective of what the rent should be, when that lease was signed, that's my thoughts and my opinion on that."  AG Kings' expert further testified during cross-examination that the "market rent is at a certain point in time, when that meeting of the minds are, most lease deals that first-year rent is reflective of the market, there are of course exceptions, . . . based on my discussions with property owners, public companies that have retail spaces, when they do a deal it's really that first year rent that's indicative of the market. . . ."

However, when performing the income capitalization approach, the failure to consider the rent step-ups payable under a lease renders the conclusions derived therefrom flawed.  As stated above, the income capitalization approach generates a present value of real estate based on the stream of income that it will produce in the future.  "The ultimate concern is the future, and while current income is a good starting point, the direction and expected rate of income change are critical to the capitalization of income as a valuation approach."  First Republic Corp. of Am., 16 N.J. Tax at 578 (emphasis added).  Accordingly, when rent step-ups payable under a lease "are known . . . , those increases in income, to the extent they reflect economic rent, should be reflected in the appraiser's estimate of the property's future income."  Ibid.

Here, AG Kings' expert's testimony revealed that in his search for the market or economic rent, he focused on "that first year rent that's indicative of the market."  Thus, he did not truly analyze the effect or influence that the rent step-ups had under the comparable retail leases on the property owner's anticipated stream of revenue flow, a pivotal consideration under the income






capitalization approach. Rather, the sole barometer by which AG Kings' expert seemingly measured whether he would consider inclusion of the rent step-ups was premised entirely on the CPI. If he viewed the step-up rents under the leases as exceeding the CPI, then he would average them. Conversely, if he viewed the step-up rents under the leases as being more closely aligned with CPI, he would consider only the first year's rent.

The court finds that the foregoing approach employed by AG Kings' expert in examining and reporting the effective rent of his comparable retail leases 2, 3, 4, and 6 does not comport with our state's caselaw, nor does it appropriately and properly account for the "direction and expected rate of income change [that] are critical to the capitalization of income." First Republic Corp. of Am., 16 N.J. Tax at 578.

Additionally, the court finds that accepting AG Kings' expert's opinion (equating first-year rent to effective rent) would diminish the reasonableness of his tenant improvement allowance analysis. In general, a landlord is willing to afford a tenant an improvement allowance, or credit to undertake improvements, only when the tenant has committed to paying the landlord a certain stream of income over a certain time. That anticipated revenue stream to be derived by the landlord (over a ten, fifteen, or twenty-year term, etc.), represents not only the landlord's anticipated return on the property, but also the landlord's anticipated return for the expenditure of renovations or tenant improvement allowances. Examining and applying only the first year's rent under a comparable lease as the effective rent fails to adequately consider the bargained for exchange between the landlord and the tenant.

Therefore, the court rejects the effective rents reported in AG Kings' expert's trial-ready appraisal report for comparable retail leases 3, 4, 6, and 7. Instead, the court will consider the trial testimony offered by AG Kings' expert supplementing and amending the trial-ready appraisal






report and identifying the "average rent" for comparable retail leases 3, 4, and 6.[11]

Moreover, the court does not find that AG Kings' expert's comparable retail lease 5 and comparable retail lease 8 accurately represent market or economic rent. Cross-examination disclosed that these were subleases of Walgreens pharmacies to Dollar Tree Stores. Cross-examination further disclosed that Walgreens, which was paying substantially more in rent for these properties,[12] executed long-term ground leases for these properties and constructed build-to-suit pharmacies, before it later elected to relocate its pharmacy, and subleased the properties to Dollar Tree for $16.24 and $14.03 per square foot, at a loss of approximately $25.76 per square foot. Thus, the court questions Walgreens' motivations in these sublease transactions (i.e., did Walgreens relocate the existing pharmacy stores and sublet the buildings to prevent another retail chain pharmacy from securing a more favorable location and impacting its revenue). In addition, the court highlights that the net rent payable under comparable retail lease 5 ($9.33) and comparable retail lease 8 ($8.01) are 47% to 70% less than the average rents of the remaining five leases. Accordingly, the court finds AG Kings' expert's comparable retail lease 5 and comparable retail lease 8 are not credible evidence of economic or market rent and accords them no weight.

In addition, the court finds that AG Kings' expert's comparable retail lease 2 is not credible evidence of economic or market rent. Effective cross-examination disclosed that comparable retail lease 2 recites that the tenant "anticipates to invest approximately $1.5M (One Million and

---

[11] Because comparable retail lease 7 was a flat net rental over the lease term, the reported effective rent remained unchanged.

[12] Under comparable retail lease 5, Walgreens was paying approximately $43,333 per month or $42.00 per square foot in rent, excluding Walgreens' net lease real estate tax obligation. In addition, AG Kings' expert expressed that he did not know the rent payable by Walgreens under comparable retail lease 8, however, he estimated that it exceeded $30 per square foot. Thus, Walgreens was subleasing comparable retail lease 8 at a minimum loss of approximately $21.99 per square foot ($30.00 - $8.01 = $21.99).






Five Hundred Thousand Dollars) for . . . leasehold improvements," several of which were capital improvements that inured to the landlord's benefit (increasing water service lines, relocating bathrooms, installing floor drains, etc.). However, AG Kings' expert was uncertain whether those capital improvements were ever undertaken. Moreover, the court questions whether the rent stipulated under comparable retail lease 2 reflected a discount due to the scope of the capital improvements that the tenant agreed to undertake to the property. Accordingly, the court finds AG Kings' expert's comparable retail lease 2 is not credible evidence of the subject property's market or economic rent.

Accordingly, the court finds AG Kings' expert's comparable retail leases 3, 4, 6, and 7 are credible evidence of the subject property's economic or market rent. Accepting AG Kings' expert's location adjustments and applying same to the average rent over the lease term, the adjusted rents of the comparable retail leases would be: (i) $23.08, comparable retail lease 3; (ii) $27.27, comparable retail lease 4; (iii) $18.66, comparable retail lease 6; and (iv) $18.70, comparable retail lease 7.

The court finds that Montclair's expert properly computed the effective rent for his six comparable supermarket rentals by averaging the rent over their initial lease term and deducting any periods of free rent.[13]

Moreover, the court finds that Montclair's expert's testimony regarding his analysis of the comparable supermarket rentals, and decision not to apply location, size, or condition adjustments

---

[13] The court highlights that Montclair's expert's comparable lease 5 is the identical lease to AG Kings' expert's comparable retail lease 3. Montclair's expert calculated the effective rent as $24.22 p.s.f. and AG Kings' expert calculated the average rent over the lease term as $24.29 p.s.f. The court finds that the $.07 difference in effective rent is inconsequential in arriving at the court's calculation of the subject property's economic or market rent.






to his comparable supermarket rentals, to be generally credible. However, the court finds AG Kings' expert's 5% downward location adjustment to comparable retail lease 3 (the identical lease to Montclair's expert's comparable supermarket rental 5) more credibly and appropriately accounts for its superior location along Route 4, Paramus, Bergen County, New Jersey. Therefore, the court will apply a similar 5% downward location adjustment to Montclair's expert's comparable supermarket rental 5.

However, effective cross-examination revealed that Montclair's expert did not possess nor review a copy of the lease agreement for comparable supermarket rental 3. Moreover, the shopping center where comparable supermarket rental 3 was located was recently renovated (in 2012-2014), thus, the court questions the role those renovations and the condition of the shopping center played in fixing the rent. In addition, Montclair's expert was unable to ascertain the tenant improvement allowance afforded under comparable supermarket rental 3. Accordingly, for the foregoing reasons, the court does not find Montclair's expert's comparable supermarket rental 3 to be credible evidence of the subject property's market or economic rent.

Accordingly, the court finds Montclair's expert's comparable supermarket rentals 1, 2, 4, 5, and 6 are credible evidence of the subject property's economic or market rent. Thus, the range of effective rents of Montclair's expert's comparable supermarket rentals is: (i) $23.00, comparable supermarket rental 1; (ii) $23.30, comparable supermarket rental 2; (iii) $26.75, comparable supermarket rental 4; (iv) $23.01, comparable supermarket rental 5 (after application of a 5% downward location adjustment); and (v) $29.00, comparable supermarket rental 6.

Analyzing AG Kings' expert's comparable retail leases 3, 4, 6, and 7, and Montclair's expert's comparable supermarket rentals 1, 2, 4, 5, and 6, discloses the following rental range:






$18.66, $18.70, $23.00, $23.08[14], $23.30, $26.75, $27.27, and $29.00. After evaluating the foregoing leases and placing primary emphasis on AG Kings' expert's comparable retail lease 3 ($23.08 p.s.f.), and Montclair's expert's comparable rentals 2 ($23.30 p.s.f.), 4 ($26.75 p.s.f.), and 5 ($23.08 p.s.f.), as those are the supermarkets/grocery stores bearing the closest location and square footage to the subject property, the court concludes an economic or market rent of $24.75, per square foot should be attributed to the subject property as of the October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020 valuation dates.

### A. Tenant improvement allowance

In "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as tenant improvement/fit-up allowances. Often, the cost of a tenant improvement allowance is built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474.

In AG Kings' expert's opinion, tenant improvement/fit-up allowances are customary for retail stores in the subject property's market area. AG Kings' expert identified eleven (11) retail leases executed between May 2015 and September 2019. According to AG Kings' expert, the tenant improvement/fit-up allowances range from $0.73 to $4.54 per square foot. Therefore, in AG Kings' expert's opinion, a tenant improvement/fit-up allowance of $2.00 per square foot, or $35,544 per year (17,772 square feet x $2.00 = $35,544) should be deducted on the subject

---

[14] AG Kings' expert's comparable retail lease 3 and Montclair's expert's comparable lease 5 are the identical lease.






property's reconstructed operating statement.

Conversely, after reviewing his six comparable supermarket rentals, Montclair's expert concluded that, "none of the leases that I saw that I could confirm, [had] any tenant improvement allowance, there was nothing in the market on these leases that told me that a tenant improvement allowance should be taken, or deducted, or recognized. The market is telling me that there is no tenant improvement allowance, I'm not going to deduct it." In Montclair's expert's opinion, tenant improvement allowances are "more common . . . in an office building or perhaps, in some instances, you'll have them in retail, but . . . its infrequent, they usually are vanilla boxes delivered to the tenant ready for tenant fixtures and equipment."

Effective cross-examination of AG Kings' expert revealed that, of the eleven leases employed in analyzing his proposed tenant improvement allowance, only two of them, comparable retail lease 3 and comparable retail lease 6, were supermarkets/grocery stores. The balance of the eleven leases were general retail stores, lab/office, restaurant, department stores, physical therapy centers, and hair salons. Thus, many of those stores do not possess the same physical characteristics and qualities as a supermarket/grocery store. In addition, six of the remaining nine leases analyzed by AG Kings' expert in determining his tenant improvement allowance were materially smaller than the subject property, ranging in size only from 1,600 to 2,819 square feet.

Importantly, cross-examination further disclosed that under AG Kings' expert's comparable retail lease 6, the landlord agreed to perform approximately $2,779,031 in structural repairs/renovations by demolishing existing demising walls and combining the demised vacant spaces. Moreover, the lease recites that the landlord afforded the tenant an improvement allowance of $854,000. However, AG Kings' expert misappropriately calculated the tenant improvement allowance for comparable retail lease 6 by including both the landlord's structural






repairs/renovations and the actual tenant improvement allowance. The court does not find that the landlord's incurred costs for, and performance of capital structural repairs/renovations to the property, which benefits the landlord's equity and ownership interest in the property, should be included in the calculation of a tenant improvement allowance, which is designed for the benefit of a particular tenant. However, excluding the landlord's structural repairs/renovations, the tenant improvement allowance under AG Kings' expert's comparable retail lease 6 amounted to approximately $1.07 per square foot annualized.

According to AG Kings' expert, under comparable retail lease 4, the landlord agreed to perform work to the property with an estimated cost of $1,300,000. However, cross-examination disclosed that AG Kings' expert did not know the type or scope of the work that the landlord agreed to perform, and whether the work amounted to structural or capital improvements. Thus, the court questions whether the work performed was accurately classified as a tenant improvement allowance, or whether this expenditure was the landlord's performance capital repairs/renovations to the building's structure.

Finally, under AG Kings' expert's comparable retail lease 7, although the lease recites that the landlord agreed to undertake work to the premises, AG Kings' expert did not know the scope of the work to be undertaken, nor the anticipated costs to be incurred for the work to be performed.

The court further highlights that AG Kings' expert's comparable retail lease 3, which is a supermarket/grocery store, affords a tenant improvement allowance of $1.54 per square foot. However, the lease expressly provides such allowance only if the tenant incurs more than $2,000,000 in improvement costs. If the tenant incurred improvement costs less than $2,000,000, the tenant improvement allowance was correspondingly reduced. However, AG Kings' expert could not identify how much the tenant actually incurred in improvement costs.






In addition, cross-examination of Montclair's expert disclosed that under his comparable supermarket rental 4, the landlord and tenant agreed to equally share in the costs of approximately $500,000 in repairs/improvements to the property, or approximately $0.58 per square foot.

Moreover, during cross-examination, Montclair's expert admitted that his comparable supermarket rental 5 states that a tenant improvement allowance of $1.54 per square foot will be afforded to the tenant if the tenant incurs costs of more than $2,000,000 in improvements. However, just like AG Kings' expert, Montclair's expert was unable to verify how much the tenant spent in improvements.

In addition, cross-examination revealed that because Montclair's expert did not possess a copy of comparable supermarket rental 3, he was unable to ascertain whether any tenant improvement allowance was provided under that lease.

After considering the experts' testimony and scrutinizing the data, the court finds that the most credible evidence of whether a tenant improvement allowance will be afforded to a supermarket/grocery store like the subject property is through examination of the other supermarket/grocery store leases. The court does not find that AG Kings' expert's analysis of leases of general retail, lab/office, restaurant, department stores, physical therapy centers, and hair salons offers credible evidence of the tenant improvement allowance that would be afforded to a supermarket/grocery store.

Rather, the court finds that an examination of AG Kings' expert's three comparable supermarket/grocery store leases and Montclair's expert's five comparable supermarket/grocery store leases offers greater insight into the tenant improvement allowance that would be afforded to a supermarket/grocery store. Here, the evidence disclosed that: (i) AG Kings' expert's comparable retail lease 3 afforded a tenant improvement allowance of approximately $1.54 per






square foot; (ii) AG Kings' expert's comparable retail lease 6 afforded a tenant improvement allowance (excluding the landlord's structural repair work) of $1.07 per square foot annualized; and (iii) AG Kings' expert's comparable retail lease 7 afforded no tenancy improvement allowance. In addition, Montclair's expert's comparable supermarket lease 2 afforded a "nominal" tenant improvement allowance, comparable supermarket lease 4 afforded a tenant improvement allowance of $0.58 per square foot and comparable supermarket lease 5 afforded a tenant improvement allowance of approximately $1.54 per square foot.

Thus, the court finds that a tenant improvement allowance for a supermarket/grocery store is supported by evidence from the marketplace. Moreover, the court finds that a tenant improvement allowance of $0.75 per square foot, annualized, is reasonable and supported by the data and evidence.

### B. Vacancy and collection loss

In reaching his concluded vacancy and collection loss factor to be applied to the subject property's reconstructing operating statement, AG Kings' expert examined published data from CoStar within the Urban Essex Retail Submarket (general retail, neighborhood center, and strip center) and northern New Jersey market as of the 3rd Quarter 2017, 3rd Quarter 2018, 3rd Quarter 2019, and 3rd Quarter 2020. According to AG Kings' expert, the data revealed vacancy rates in the Urban Essex Retail Submarket ranging from 2.407% to 5.671%, and in the northern New Jersey market ranging from 3.97% to 4.85% during the tax years at issue. In addition, AG Kings' expert opined that the collection loss factor for retail property is approximately 1% to 2%. Therefore, after reviewing that data, AG Kings' expert opined a stabilized vacancy and collection loss factor of 5% should be applied to the subject property for the 2018, 2019, 2020, and 2021 tax years.

Similarly, Montclair's expert reviewed published data from CoStar within the Urban Essex






Retail Submarket (neighborhood center) as of the 3rd Quarter 2017, 3rd Quarter 2018, 3rd Quarter 2019, and 3rd Quarter 2020. Montclair's expert's review of that data disclosed that the vacancy rate for neighborhood retail centers had a four-year average of 1.65% during the tax years at issue. Moreover, Montclair's expert testified that the subject property has been continuously occupied by Kings and operated as a supermarket since at least 2006. After reviewing the data and the subject property's vacancy history, Montclair's expert opined a stabilized vacancy and collection loss factor of 3% should be applied to the subject property for the 2018, 2019, 2020, and 2021 tax years.

The court's review of the of the CoStar reports for the Urban Essex Retail submarket, including the general retail, neighborhood center, and strip center, disclosed a vacancy range of 0.0% to 5.8% during the tax years at issue, with a mean of approximately 3%. The court finds more credible Montclair's expert's testimony that a 3% vacancy and collection loss factor are reasonable and supported by the market data. Accordingly, the court will apply a vacancy and collection loss factor of three percent (3%) to the subject property's potential gross income as of the October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020 valuation dates.

C.    Stabilization

Stabilization "involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property." First Republic Corp. of America, 16 N.J. Tax at 579 (Tax 1997) (citing The Dictionary of Real Estate Appraisal, 344-45 (3rd ed. 1993)). Consistent with that principle, under the income capitalization approach, an appraiser must perform a "comprehensive analysis of the annual expenses" and income of the property being appraised. The Appraisal of Real Estate, at 453. As part of that analysis, an appraiser prepares a reconstructed operating






statement to "reflect the potential future performance of a property, considering the historical income and expenses of an investment property." Ibid. Through an examination and analysis of a property's historical income and expense data, when measured against comparable properties in the marketplace, an appraiser can discern the potential future performance of the property over its economic life.

### 1. Operating expenses and reserves

Here, both experts concluded that: (i) a stabilized management expense of five percent (5%) of effective gross income; and (ii) a stabilized leasing commission expense of five percent (5%) of effective gross income, were reasonable and should be applied to the subject property's reconstructed operating statement. Moreover, the experts concluded structural reserve operating expense deviated by only 1%. However, the experts parted ways in their conclusions regarding whether a professional fee expense should be applied.

The court finds the experts' conclusions that a stabilized operating expense deduction for: (i) management of five percent (5%) of effective gross income; and (ii) leasing commissions of five percent (5%) of effective gross income, are reasonable and supported by the evidence.

### a. Structural reserves

AG Kings' expert testified that he spoke with brokers, property managers, and developers in the marketplace about structural reserves. In addition, according to AG Kings' expert, he reviewed PwC Real Estate Investor surveys for the 3rd quarters of 2017, 2018, and 2019, disclosing a replacement reserve range of $0.10 to $1.00 per square foot. Accordingly, AG Kings' expert opined that a structural reserve allowance of 2% of effective gross income should be applied on the subject property's reconstructed operating statement.

Montclair's expert expressed that the subject property is a "triple net lease . . . the landlord's






expenses would be limited to structural repairs, professional management, which is inclusive of professional fees or administrative costs, as well as leasing commissions." Accordingly, "based on reserve conditions and [his] review of the permits and maintenance of the facility," he opined that a 1% structural reserve allowance was reasonable. Montclair's expert further credibly testified that in arriving at this figure he has analyzed "numerous income and expense statements on, not only supermarkets but retail stores in and around the immediate area, including the Whole Foods on Bloomfield Avenue and the ACME on . . . Valley Road, just south of this property."

After hearing the testimony and analyzing the evidence, the court finds that a structural reserve expense of 1% of effective gross income, or approximately $0.25 per square foot is reasonable and supported by the data in the marketplace. The court highlights that the PwC Real Estate Investor surveys of private investment firms for the 3rd quarters of 2018, 2019, and 2020, discloses replacement reserves ranging from $0.20 to $0.40 per square foot in the national strip shopping center market.

b. Professional fees

AG Kings' expert opined that professional fees such as accounting and legal fees are a customary and recurring annual expense for owners of retail property. Accordingly, after reviewing Institute of Real Estate Management (IREM) data, he opined that a stabilized professional fee expense of $5,000 per year was reasonable.

Conversely, Montclair's expert expressed that his "professional management [fee of 5%], . . . is inclusive of professional fees or administrative costs." Thus, no separate deduction for professional fees is warranted on the subject property's reconstructed operating statement.

Cross-examination disclosed that AG Kings' expert was unaware whether the IREM data includes professional fees as a component or subset of its management fees. Thus, if IREM






includes professional fees as a component of its management fee data, then including a separate deduction for professional fees would result in the double dipping of an operating expense.

The court finds Montclair's expert's testimony more credible, that the management fee of 5% of effective gross income would include the reasonable professional and administrative expenses associated or incurred in connection with managing a property like the subject property. Accordingly, the court will not deduct a separate professional fee on the subject property's reconstructed operating statement.

2.  Capitalization

The direct capitalization approach "convert[s] an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

Here, to derive their capitalization rates, AG Kings' expert and Montclair's expert both undertook a review of data, including investor surveys, and published capitalization rates.[15] Although both experts employed the band of investment technique to derive a capitalization rate, AG Kings' expert testified that he placed greater weight on the debt coverage formula.[16]

---

[15]  AG Kings' expert relied on ACLI and PwC surveys, and Montclair's expert relied on ACLI, PwC, Situs/RERC surveys, and his discussions with a local lending institution.

[16]  "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.






The band of investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)). The debt coverage formula takes a property's debt coverage ratio ("DCR") (the ratio of net operating income to annual debt service or net operating income divided by total debt service) and multiplies the DCR by a mortgage constant and loan-to-value ratio to discern an estimated capitalization rate. The debt coverage ratio formula is frequently utilized by banks and other lending institutions to gauge whether a prospective borrower will have sufficient cash flow to meet debt obligations.

The DCR is computed by estimating a property's net operating income and then dividing that figure by the estimated debt service. Expressed as a formula DCR = net operating income/debt service. However, because the debt coverage formula measures the ability of a business or property to repay interest and principal on a loan, it presumes the accuracy of the estimated net operating income to generate the DCR (and consequently the capitalization rate). Thus, if the net operating figures are inaccurate, the DCR and resulting capitalization rate derived therefrom will also be inaccurate.

Here, the court found AG Kings' expert's market or economic rent and certain stabilized expenses were inaccurate, thus, AG Kings' expert's proffered net operating income values and resulting DCR would also be inaccurate. For example, as of the October 1, 2019 valuation date, AG Kings' expert determined a DCR of 1.92 and net operating income of $286,319, accordingly, the estimated annual debt service would be $149,125 ($286,319/1.92 = $149.125). Thus, to generate AG Kings' expert's proffered 8.23% capitalization rate under the debt coverage formula (assuming his 61.57% loan-to-value ratio and his twenty-year (20) loan amortization term), an

   

interest rate of three-and-one-half (3.50%) percent would have to be applied to generate a .0696 mortgage constant (1.92 x. .6157 x .0696 = 8.23%).[17]  However, because AG Kings' expert's net operating income calculations are inaccurate, his debt coverage formula does not align with the reported market or survey data.  In sum, the court finds AG Kings' expert's use of a debt coverage formula to compute the subject property's capitalization rate lacks credibility.  Rather, because the band of investment technique is not directly tied to a property's estimated net operating income, it produces a more accurate capitalization rate.

AG Kings' expert's band of investment analysis revealed the following capitalization rates, as of each valuation date: (i) 7.43% as of October 1, 2017 (4.15% interest rate, 60% loan-to-value ratio, twenty (20) year amortization period, and 7.53% equity dividend rate); (ii) 7.67% as of October 1, 2018 (4.47% interest rate, 60% loan-to-value ratio, twenty (20) year amortization period, and 7.81% equity dividend rate); (iii) 7.10% as of October 1, 2019 (4.06% interest rate, 62% loan-to-value ratio, twenty (20) year amortization period, and 6.77% equity dividend rate); and (iv) 7.05% as of October 1, 2020 (3.73% interest rate, 54% loan-to-value ratio, twenty (20) year amortization period, and 7% equity dividend rate).

Montclair's expert concluded the following capitalization rates, as of each valuation date: (i) 6.29%, as of October 1, 2017 (4.375% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 5.605% equity dividend rate); (ii) 6.458%, as of October 1, 2018 (4.375% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 6.165% equity dividend rate); (iii) 6.56%, as of October 1, 2019 (5.373% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 4.88% equity dividend rate); and (iv)

---

[17]  However, AG Kings' expert employed a 4.06% interest rate for the 2020 tax year.






6.037%, as of October 1, 2020 (4.373% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 4.76% equity dividend rate).

The court's own review and analysis of the above information discloses that: (i) as of the October 1, 2017 valuation date, retail property interest rates ranged from 3.67% to 4.58%, loan-to-value ratios were 53% to 63%, treasury yields were 2.34% to 2.87%, and extracted equity dividend rates were 6.35%; (ii) as of the October 1, 2018 valuation date, retail property interest rates ranged from 4.24% to 4.85%, loan-to-value ratios were 56% to 69%, treasury yields were 3.09% to 3.24%, and extracted equity dividend rates were 6.07%; (iii) as of the October 1, 2019 valuation date, retail property interest rates ranged from 3.62% to 4.23%, and loan-to-value ratios were 59% to 66%, treasury yields were 1.65% to 2.11%, and extracted equity dividend rates were 7.41%; (iv) as of the October 1, 2020 valuation date, retail property interest rates ranged from 3.25% to 3.94%, loan-to-value ratios were 51% to 58%, treasury yields were 1.48% to 2.04%, and extracted equity dividend rates were 2.61%.

Accordingly, based on a review of the above data and information, as well as the experts' testimony and opinions, the court concludes that Montclair's expert's band of investment data and analysis as of the October 1, 2017, October 1, 2018, and October 1, 2020 valuation periods produce a result that is more accurate and credible. Moreover, the court accepts Montclair's expert's October 1, 2019 band of investment analysis with one minor revision. The court finds that an interest rate of 4.375%, as of the October 1, 2019 valuation date is more reasonable and comports with the published data. Thus, the capitalization rate, as of the October 1, 2019 valuation date should be: 6.07% (4.375% interest rate, 70% loan-to-value ratio, twenty-five (25) year amortization period, and 4.88% equity dividend rate).

Therefore, the court concludes that the following capitalization rates should apply to the






subject property: (i) 6.29%, as of the October 1, 2017 valuation date; (ii) 6.458%, as of the October 1, 2018 valuation date; (iii) 6.07%, as of the October 1, 2019 valuation date; and (iv) 6.037%, as of the October 1, 2020 valuation date.

Accordingly, the subject property's reconstructed operating statement for the 2018, 2019, 2020, and 2021 tax years is set forth below:

**2018, 2019, 2020 and 2021 Tax Years**

INCOME:

| | | | |
|---|---|---|---|
| Supermarket/grocery store | $24.75 p.s.f. | @ 17,772 sq. ft. | $ 439,857 |
| Total: | Potential Gross Income | | $ 439,857 |
| Less: | Vacancy & Collection loss | @ 3.00% PGI | ($ 13,196) |
| Total: | Effective Gross Income | | $ 426,661 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Leasing Commissions | @ 5% of EGI | $21,333 |
| Management | @ 5% of EGI | $21,333 |
| Replacement Reserves | @ 1% of EGI | $ 4,267 |
| Tenant Improvement Allowance | @ $0.75 PSF | $13,329 |
| Total: | | ($60,262) |

NET OPERATING INCOME: (2018, 2019, 2020 & 2021 tax years)      $ 366,399

| | | |
|---|---|---|
| 2018 CAPITALIZATION RATE: | 6.29% | |
| 2018 APLICATION OF CAPITALIZATION RATE: ($366,399/.0629) | | $5,825,103 |
| 2018 CONCLUDED VALUE | | $5,825,000 |
| | | |
| 2019 CAPITALIZATION RATE: | 6.458% | |
| 2019 APLICATION OF CAPITALIZATION RATE: ($366,399/.06458) | | $5,673,568 |
| 2019 CONCLUDED VALUE | | $5,675,000 |
| | | |
| 2020 CAPITALIZATION RATE: | 6.07% | |
| 2020 APLICATION OF CAPITALIZATION RATE: ($366,399/.0607) | | $6,036,227 |
| 2020 CONCLUDED VALUE | | $6,050,000 |
| | | |
| 2021 CAPITALIZATION RATE: | 6.037% | |
| 2021 APLICATION OF CAPITALIZATION RATE: ($366,399/.06037) | | $6,069,223 |
| 2021 CONCLUDED VALUE | | $6,100,000 |

Accordingly, the court finds the subject property's true or fair market value to be: (i)






$5,825,000, as of the October 1, 2017 valuation date; (ii) $5,675,000, as of the October 1, 2018

valuation date; (iii) $6,050,000, as of the October 1, 2019 valuation date; and (iv) $6,100,000, as

of the October 1, 2020 valuation date.

### 3. Corrected Local Property Tax Assessment

Having reached conclusions of the subject property's true or fair market value, the court

will turn its attention to determining the subject property's correct assessment for the 2018, 2019,

2020, and 2021 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is

satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed

valuation of the subject property to its true value exceeds the upper limit or falls below the lower

limit of the common level range, it shall enter judgment revising the taxable value of the property

by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This

process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

However, during a revaluation year, the Chapter 123 ratio does not apply. N.J.S.A. 54:51A-6(d).

The reason for this is simple, during a revaluation year it is presumed that all properties in a taxing

district are assessed at true value, or 100% of the true or fair market value. See City of E. Orange

v. Livingston Twp., 27 N.J. Tax 161, 176 (Tax 2013).

The 2018 tax year was a revaluation year, consequently, the subject property's corrected

tax assessment is $5,825,000. Accordingly, a judgment establishing the local property tax

assessment for the subject property for tax year 2018 will be entered as follows:

| | |
|---|---|
| Land | $3,368,500 |
| Improvement | $2,456,500 |
| Total | $5,825,000 |

For the 2019 tax year, the ratio of assessed value, $6,150,400, to true market value,

   

$5,675,000, yields a ratio of 108.40% ($6,150,400/$5,675,000 = 108.40%), which exceeds

Montclair's upper limit (100%) and lower limit (76.70%) of the Chapter 123 common level range.

Consequently, the subject property's tax assessment calculation for the 2019 tax year is:

$5,675,000 x .9023 =      $5,120,600 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2019 will be entered as follows:

| | |
|---|---|
| Land | $3,368,500 |
| Improvement | $1,752,100 |
| Total | $5,120,600 |

For the 2020 tax year, the ratio of assessed value, $6,150,400, to true market value,

$6,050,000, yields a ratio of 101.66% ($6,150,400/$6,050,000 = 101.66%), which exceeds

Montclair's upper limit (100%) and lower limit (76.70%) of the Chapter 123 common level range.

Consequently, the subject property's tax assessment calculation for the 2020 tax year is:

$6,050,000 x .8951 =      $5,415,400 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2020 will be entered as follows:

| | |
|---|---|
| Land | $3,368,500 |
| Improvement | $2,046,900 |
| Total | $5,415,400 |

For the 2021 tax year, the ratio of assessed value, $6,150,400, to true market value,

$6,100,000, yields a ratio of 100.83% ($6,150,400/$6,150,400 = 100.83%), which exceeds

Montclair's upper limit (100%) and lower limit (74.84%) of the Chapter 123 common level range.

Consequently, the subject property's tax assessment calculation for the 2021 tax year is:

$6,100,000 x .8805 =      $5,371,000 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject






property for tax year 2021 will be entered as follows:

| | |
|---|---|
| Land | $3,368,500 |
| Improvement | $2,002,500 |
| Total | $5,371,000 |

Accordingly, contemporaneous herewith judgments reducing the subject property's 2018, 2019, 2020, and 2021 local property tax assessments shall be entered.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




